# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 26, 2016          Decided August 29, 2017

No. 15-1330

SNR WIRELESS LICENSECO, LLC,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

Consolidated with 15-1331, 15-1332, 15-1333

On Petitions for Review of an Order of
the Federal Communications Commission

*Catherine E. Stetson* argued the cause for appellants. With her on the briefs were *Christopher J. Wright*, *Timothy J. Simeone*, *Elizabeth Austin Bonner*, *Paul J. Caritj*, *Ari Q. Fitzgerald*, and *R. Craig Kitchen*. *Mark F. Dever*, *Dorothy A. Hickok*, *Alfred W. Putnam Jr.*, and *Mark H. Sosnowsky* entered appearances.

*Harold J. Feld* was on the brief for *amicus curiae* Public Knowledge in support of petitioner-appellants.

*Lawrence Spiwak* was on the brief for *amicus curiae* Phoenix Center for Advanced Legal and Economic Public Policy Studies in support of petitioners-appellants.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Jonathan B. Sallet*, General Counsel, Federal Communications Commission, and *Jacob M. Lewis*, Associate General Counsel. *David M. Gossett*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel, entered appearances.

Before: BROWN and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Petitioners SNR Wireless LicenseCo, LLC (SNR) and Northstar Wireless, LLC (Northstar) are two nascent companies that took action to acquire the wireless spectrum needed to sell wireless internet or phone services to customers around the country. Because of the high cost of providing wireless services, petitioners borrowed billions of dollars from DISH Network Corporation and its subsidiaries (collectively, DISH) to acquire the spectrum. DISH also agreed to provide management services to petitioners to help them navigate the challenges of building a national wireless network.

In 2014, the Federal Communications Commission (FCC or the Commission) held an auction to sell the kind of wireless spectrum licenses that petitioners would need to build national businesses. Pursuant to FCC regulations designed to

encourage small businesses to participate in such auctions, the FCC announced that businesses with less than $40 million in annual revenues could use "bidding credits" to purchase at a discounted price any licenses they won. Petitioners submitted initial short-form applications disclosing their revenues, on the basis of which they were permitted to bid. Believing that they would be entitled to use bidding credits, petitioners bid on and won hundreds of spectrum licenses in the action. While the petitioners' winning bids totaled $13.3 billion, petitioners asked the FCC for $3.3 billion in bidding credits, which would bring the total cost of the licenses down to $10 billion.

The FCC denied the request to use bidding credits because SNR and Northstar were not simply partners with DISH, but were under DISH's control. As a result, DISH's $13 billion in annual revenues were attributable to petitioners, making them ineligible for bidding credits.

After the FCC denied their application to use bidding credits, petitioners informed the FCC that they could not afford to pay for all of the licenses they won. They bought some of the licenses at full price and relinquished the rest to the FCC. The FCC fined the petitioners hundreds of millions of dollars for failing to comply with the auction terms that required all bidders to purchase the licenses they won. This appeal followed.

The FCC reasonably determined that DISH exercised *de facto* control (a broad concept about which we have more to say later) over SNR and Northstar's businesses: DISH had contractual rights to manage almost all of the essential elements of the petitioners' businesses, and petitioners faced enormous financial pressure to sell their companies to DISH after five years. In addition, petitioners' auction bids suggested they were both functioning as arms of DISH, rather than as

independent small companies each pursuing their own, independent interests. As the FCC has also recognized, however, for companies like DISH that seek to form partnerships with small businesses, there is a fine line between providing the sort of oversight necessary to keep the partnership on track and providing so much oversight that the small business is subject to disqualifying *de facto* control. Petitioners point to past action of the FCC's Wireless Bureau that they assert led them to conclude that their agreements with DISH were not so controlling as to disqualify them from obtaining the credits due to "very small" businesses.

We hold that: (1) The FCC reasonably applied its longstanding precedent to determine that DISH exercised a disqualifying degree of *de facto* control over SNR and Northstar; but (2) the Commission did not give SNR and Northstar adequate notice that, if their relationships with DISH cost them their bidding credits, the FCC would also deny them an opportunity to cure. As a result, we remand this matter to the FCC to give petitioners an opportunity to seek to negotiate a cure for the *de facto* control the FCC found that DISH exercises over them.

## I. Background

### A. The FCC's Auction 97

The electromagnetic spectrum is "the range of electromagnetic radio frequencies used to transmit sound, data, and video across the country." *See* FCC, *About the Spectrum Dashboard*, http://reboot.fcc.gov/reform/systems/spectrum-dashboard/about (*About the Spectrum*). Under the Communications Act of 1934 (the Act), the FCC may grant private companies licenses to use portions of the spectrum. *See* 47 U.S.C. §§ 307, 309. Once licensed, companies may transmit sound, data, and video, which enables them to provide

television, cell phone, and wireless internet service to consumers. *See About the Spectrum*.

In 1993, Congress authorized the FCC to use auctions to allocate spectrum licenses. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312 (relevant section codified at 47 U.S.C. § 309(j)(1)). Congress directed the FCC to design auction procedures that would serve a number of policy objectives. Those objectives include promoting efficient, intensive, and innovative use of the electromagnetic spectrum without excessive concentration of licenses, while advancing economic opportunity and competition by disseminating licenses "among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women" without "unjust enrichment" of licensees that are not *bona fide* small or underrepresented businesses. *See id.* § 309(j)(3)-(4).

Consistent with those statutory instructions, FCC regulations provide that the Commission may encourage "designated entities," including small businesses, to participate in spectrum auctions by giving them bidding credits, *i.e.* discounts that may be used to cover part of the cost of any licenses those businesses win. 47 C.F.R. § 1.2110(a), (f) (2012).[1] FCC regulations specify that bidding credits can only be used by genuine small businesses—not by small sham companies that are managed by or affiliated with big businesses. *See, e.g.*, *id.* § 1.2110(b)-(c).

This case arose out of Auction 97, which the FCC announced on May 19, 2014. On July 23, 2014, the FCC's

---

[1] Throughout this opinion, we will cite the version of the FCC's regulations in effect at the time of Auction 97, rather than the version in effect today, unless otherwise noted.

Wireless Telecommunications Bureau (the Wireless Bureau) published the procedures for the auction (the Auction Notice, or Notice). The Auction Notice explained that small businesses would be eligible to receive bidding credits in Auction 97, and the size of the bidding credits would depend on the amount of the designated entities' "attributable" revenues over the preceding three years: Entities with less than $40 million in attributable annual revenues could receive a fifteen percent discount on their winning bids, and entities with less than $15 million in attributable annual revenues could receive a twenty-five percent discount. *See Auction of Advanced Wireless Servs. (Aws-3) Licenses Scheduled for Nov. 13, 2014*, 29 F.C.C. Rcd. 8386, 8411-12 (2014) (*Auction Notice*).

As relevant here, attributable revenues included the revenues of the small business itself and the revenues of any entity with "*de facto* control" over it. *Id.* at 8412-13 (citing 47 C.F.R. § 1.2110(b)-(c), among other sources). Whereas the question whether one business exercises *de jure* control over another is binary, the highly contextual question of *de facto* control is a matter of degree.

FCC regulations that had been used in past auctions listed various "indicia of control" relevant to the *de facto* control inquiry. *See* 47 C.F.R. § 1.2110(c)(2). They pointed to control over appointments to the entity's board or management committee, control over selection and employment of the senior executives in charge, or general involvement in management decisions. *Id*. The regulations also highlighted as a factor relevant to *de facto* control the presence of a management agreement conferring on someone other than the entity itself authority to determine or significantly influence the nature or types of service the entity offers, or the terms or price on which they are offered. *Id*. § 1.2110(c)(2)(ii)(H). The

regulations did not, however, delineate a clear line between permissible influence and *de facto* control.

The Auction Notice generally explained that auction participants should "review carefully the Commission's decisions regarding . . . designated entit[ies]." *Auction Notice*, 29 F.C.C. Rcd. at 8411. The Notice stated, by reference to FCC regulations, that "[*d*]*e facto* control [would be] determined on a case-by-case basis," *id.* at 8412 (citing 47 C.F.R. § 1.2110(b)(5)). It cautioned participants that *de facto* control might be present if, for example, one company "plays an integral role in [the] management decisions" of another. *Id.* at 8413 (citing 47 C.F.R. § 1.2110(c)).

By way of additional guidance, the Notice directed auction participants to consult the Commission's longstanding but context-dependent precedent on the circumstances that bear on *de facto* control. The two opinions the Notice cited on that point articulate a six-factor test for *de facto* control: *Intermountain Microwave*, Public Notice, 12 F.C.C. 2d 559 (1963) (*Intermountain Microwave*) and *Baker Creek Communications, L.P.*, Memorandum Opinion and Order, 13 F.C.C. Rcd. 18709 (1998) (*Baker Creek*). *Id.* at 8412 n.151.

The Auction Notice specified that the FCC would use its standard, two-step process to verify the attributable revenues of a small business. *Id.* at 8407. First, before the auction, a small business seeking to qualify for credits had to file a "streamlined, short-form application." *Id.* That form required the business to state, under penalty of perjury, its attributable revenues. *See id.* (citing 47 C.F.R. § 1.2105); *see also id.* at 8412. Second, after the auction concluded, any business that successfully bid for a spectrum license and sought bidding credits would have to "file a more comprehensive long-form application (FCC Form 601)" to hold the license. *Id.* at 8407.

The Commission would then review the long-form application to verify the business's eligibility for small-business bidding credits.

Auction 97 began on November 13, 2014, and concluded on January 29, 2015, after 341 rounds of bidding. Thirty-one entities won spectrum licenses, with winning bids totaling more than $40 billion.

## B. Petitioners' Conduct

The petitioners are small companies that were formed just in time to file short-form applications for Auction 97: SNR was formed fourteen days and Northstar was formed eight days before the application deadline. As nascent companies, SNR and Northstar lacked officers, directors, and revenues when they each submitted a short-form application to participate in Auction 97 as a "very small business" entitled to a twenty-five percent discount. *In re Northstar Wireless, LLC*, 30 F.C.C. Rcd. 8887, 8893 (2015) (*FCC Op.*).[2]

The petitioners' short-form applications disclosed that they had acquired the capital that they needed to participate in the auction from DISH—a large, established corporation that was itself ineligible for bidding credits. In exchange for its investments in SNR and Northstar, DISH acquired an (indirect) eighty-five percent ownership interest in each company. In addition, DISH became the operations manager for SNR and

---

[2] *See* SNR Wireless LicenseCo, LLC Short-Form Application, FCC Form 175, Auction File No. 0006458318 (filed September 12, 2014, amended October 13, 2014) (SNR Short-Form Application), Attachments A, B; *see* Northstar Wireless, LLC Short-Form Application, FCC Form 175, Auction File No. 0006458325 (filed September 12, 2014, amended October 8, 2014, October 15, 2014) (Northstar Short-Form Application), Attachments A, B.

Northstar with great influence over their operations. DISH also adopted joint bidding protocols and agreements with the petitioners, which provided that DISH, SNR, and Northstar could coordinate their bidding strategies for Auction 97.

The petitioners were remarkably successful in Auction 97, collectively winning 43.5% of the licenses in play: SNR won 357 of the 1,614 auctioned licenses, and Northstar won 345. While SNR and Northstar bid a total of $13,327,423,700 during the auction, both companies claimed that they were very small businesses entitled to use FCC bidding credits to cover twenty-five percent of the cost of the licenses. With the use of those bidding credits, SNR and Northstar would together save roughly $3.3 billion.

After the auction, SNR and Northstar submitted long-form applications for the licenses, reiterating their assertions that they were very small businesses entitled to bidding credits. Once the long-form applications became public, eight parties petitioned the Wireless Bureau to deny credits to SNR and Northstar. The challengers included a few of petitioners' less successful bidding competitors and several nonprofit organizations supportive of the designated-entity credit program as a means to aid small businesses, rural telephone companies, and businesses owned by members of minority groups and women, but opposed to what they view as an abuse of the program to enrich large, established firms like DISH.

All eight challengers argued that SNR and Northstar could not claim very-small-business credits because DISH, a large business, effectively controlled them. Some entities also suggested that SNR and Northstar should not be permitted to claim the licenses they won even if they were willing to pay full price on the ground that they withheld from the FCC material information about their relationships with DISH. The

Wireless Bureau referred the petitions to the full Commission for "consideration of the questions posed by the petitions to deny." *See* 47 C.F.R. § 0.5(c) ("In non-hearing matters, the [Wireless Bureau] is at liberty to refer any matter at any stage to the Commission for action, upon concluding that it involves matters warranting the Commission's consideration . . . .").

The FCC dismissed six of the petitions on the ground that parties who had not themselves participated in the auction lacked standing, but considered the merits of the other two. *FCC Op.*, 30 F.C.C. Rcd. at 8904-05. Ultimately, the FCC decided that SNR and Northstar were not entitled to bidding credits because they were *de facto* controlled by DISH, such that DISH's large annual revenues were attributable to them. *See id.* at 8889.

While the FCC held SNR and Northstar ineligible for bidding credits, it concluded that the companies could retain the spectrum licenses they won in the auction if they were willing to pay full price for them. *See id.* at 8940-48. "The fact that the Commission, upon review of the Agreements, conclude[d] that, as a legal matter, the facts disclosed show that DISH controlled the applicants does not compel a finding that the applicants lacked candor." *Id*. at 8941. The Commission explained that SNR and Northstar had disclosed their relationships with DISH, and no participant in Auction 97 had shown that it was harmed by SNR or Northstar's conduct. *See id.* at 8940-46. Nor had any auction participant shown that SNR and Northstar colluded with one another in violation of federal antitrust laws. *Id.* at 8946-48. The FCC consequently gave SNR and Northstar the opportunity to purchase the licenses at full price, but it did not give them the opportunity to seek to cure the identified control problems.

Following the FCC's Decision, SNR and Northstar notified the Commission that they would pay the full bid amount for some of the licenses they won and would default on their obligation to buy the rest.[3] As a result of the default, the FCC ordered SNR and Northstar to compensate it for the difference between their own winning bids in Auction 97 and the amount that the FCC receives when it re-auctions the licenses. *FCC Op.*, 30 F.C.C. Rcd. at 8950-51; *see* 47 C.F.R. § 1.2104(g)(2)(i) (requiring defaulters to compensate the FCC in the manner the FCC described). The FCC also ordered petitioners to make an additional payment equal to fifteen percent of the petitioners' own bids, or fifteen percent of the winning bid when their licenses are re-auctioned, whichever is less. *See FCC Op.*, 30 F.C.C. Rcd. at 8950-51; 47 C.F.R. § 1.2104(g)(2)(ii) (requiring defaulters to pay a penalty set by the FCC prior to each auction); *Auction Notice*, 29 F.C.C. Rcd. at 8451 (announcing the fifteen-percent penalty for defaulters in Auction 97). While the exact amount of the petitioners' penalties depends on the winning price for the relevant licenses at re-auction, 47 C.F.R. § 1.2109; *see also id.* § 1.2104(g)(2), the parties anticipate that the penalties will amount to hundreds of millions of dollars. Because of the size of the penalties for default, SNR and Northstar each made partial, "interim" payments to the Commission: SNR paid $181,635,840 and Northstar paid $333,919,350.[4]

After making their interim payments, both SNR and Northstar petitioned this court for review of the FCC's decision.

---

[3] *See* Letter to Ari Q. Fitzgerald, Esq., Counsel for SNR Wireless LicenseCo, LLC, from Roger C. Sherman, Chief, Wireless Telecommunications Bureau, FCC, 30 F.C.C. Rcd. 10704 (Oct. 1, 2015); Letter to Mark F. Dever, Esq., Counsel for Northstar Wireless, LLC, from Roger C. Sherman, Chief, Wireless

## II. Analysis

The petitioners SNR and Northstar urge us to reverse the FCC's decision for two primary reasons. First, the petitioners contend, the Commission departed from agency precedent without explanation. Second, even if the Commission followed its own precedents, petitioners insist those precedents did not provide fair notice that their relationship with DISH could cost them their bidding credits plus a penalty for defaulting without an opportunity to cure. Petitioners' first argument fails, but the second has merit.

### A. The FCC Reasonably Applied its Own Precedent

We must defer to the FCC's decision in this case unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). The scope of review under the arbitrary and capricious standard is "narrow" and we cannot "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Our job is simply to ensure that the Commission "articulate[d] a satisfactory explanation for its action." *Id.* To provide a satisfactory explanation, an agency must acknowledge and explain any departure from its precedents. *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (citing *Pontchartrain Broad. Co. v. FCC,* 15 F.3d 183, 185

---

Telecommunications Bureau, FCC, 30 F.C.C. Rcd. 10700 (Oct. 1, 2015).

[4] *See* Letter to Ari Q. Fitzgerald, Esq., Counsel for SNR Wireless LicenseCo, LLC, from Roger C. Sherman, Chief, Wireless Telecomm. Bureau, FCC, 30 F.C.C. Rcd. 10704, 10706 (Oct. 1, 2015); Letter to Mark F. Dever, Esq., Counsel for Northstar Wireless, LLC, from Roger C. Sherman, Chief, Wireless Telecomm. Bureau, FCC, 30 F.C.C. Rcd. 10700, 10702 (Oct. 1, 2015).

(D.C. Cir. 1994)); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (*Fox I*).

Petitioners argue that the FCC departed without explanation from its precedent regarding designated entities. But that simply is not the case. Far from ignoring Commission decisions, the FCC reasonably interpreted and applied them when it determined that DISH had *de facto* control over SNR and Northstar. We accordingly affirm the Commission's decision that the petitioners are required to pay full price for the spectrum licenses they won in Auction 97.

The Commission began with its own settled regulations and precedent. Established FCC precedent highlights that the likelihood of a *de facto* control finding is "greatly increased" in cases like this one, where a large company (DISH) is the "single entity provid[ing] most of the capital and management services" for smaller companies. *FCC Op.*, 30 F.C.C. Rcd. at 8911 (quoting *In re Implementation of Section 309(j) of the Commc'ns Act - Competitive Bidding*, 10 F.C.C. Rcd. 403, 456 (1994) (*Fifth MO&O*)). With that warning in mind, the Commission looked to three different sources of law to determine whether DISH had *de facto* control over SNR and Northstar: (1) 47 C.F.R. § 1.2110(c)(2)(ii)(H), the regulation specifying that one company has *de facto* control over another if it manages the operations of the other and has the ability to "determine, or significantly influence" the services offered by the other; (2) the Wireless Bureau decisions, *Intermountain Microwave* and *Baker Creek*, that articulated the six-factor test that the FCC has used for decades in a range of circumstances to determine whether one company controls another; and (3) the Commission's *Fifth Memorandum Opinion & Order*, an opinion regarding the implementation of the competitive bidding system under Section 309(j) of the Communications Act, which describes situations where *de facto* control is

present. Drawing on those sources, the Commission reasonably determined that each counseled in favor of a finding that DISH *de facto* controlled SNR and Northstar.

### 1. The FCC's *De Facto* Control Regulations

The FCC looked to its regulations elaborating the concept of *de facto* control, focusing in particular on their treatment of management agreements granting another entity control over a putative small business. One of those regulations states that

> [a]ny person who manages the operations of [a small business] pursuant to a management agreement shall be considered to have a controlling interest in [the small business] if [that] person, or its affiliate, has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence . . . [t]he nature or types of services offered by [the small business].

47 C.F.R. § 1.2110(c)(2)(ii)(H). Applying that regulation, the FCC found that DISH had a controlling interest due to the way in which it "manage[d]" the operations of SNR and Northstar. *See FCC Op.*, 30 F.C.C. Rcd. at 8938. In that role, DISH had authority to limit the wireless technology that SNR and Northstar used. *Id.* Additionally, DISH managed the "build-out and day-to-day operations" of both companies. *Id.* As a result, DISH could "significantly influence" the "type of service[]" that SNR and Northstar provided for their customers. *Id.* at 8938-40 & n.359. We find nothing unreasonable about the Commission's application of its regulations.

### 2. The Six-Factor *De Facto* Control Test

The meat of the FCC's analysis of petitioners' circumstances referred to the six factors that *Intermountain*

*Microwave* identifies as particularly relevant to whether one entity has *de facto* control over another. *See FCC Op.*, 30 F.C.C. Rcd. at 8911-36 (relying on *Intermountain Microwave* factors). *See also, e.g.*, *In re Amendments to Parts 1, 2, 87 & 101 of the Comm'n's Rules to License Fixed Servs. at 24 GHz*, 15 F.C.C. Rcd. 16934, 16970 n.251 (2000) (*Amendments*) (endorsing the *Intermountain Microwave* test); *In re Application of Ellis Thompson Corp.*, 9 F.C.C. Rcd. 7138, 7138-39 (1994) (*Ellis Thompson I*).

The *Intermountain Microwave* test asks: (1) who controls the daily operations of the small business; (2) who employs, supervises, and dismisses the small business's employees; (3) whether the small business has "unfettered" use of all its facilities and equipment; (4) who covers the small business's expenses, including its operating costs; (5) who receives the small business's revenues and profits; and (6) who makes and carries out the policy decisions of the small business. *See Intermountain Microwave,* 12 F.C.C. 2d at 560.

Addressing the first question, the FCC found that DISH had control over the daily operations of SNR and Northstar. The Commission acknowledged that DISH's agreements with SNR and Northstar contained some language "purporting to give SNR and Northstar control over day-to-day operations," *see FCC Op.*, 30 F.C.C. Rcd. at 8918, but that language had almost no practical effect, *see id.* As noted above, DISH agreed to be the Operations Manager for both SNR and Northstar. *See id.* at 8897-98. Under the parties' comprehensive Management Services Agreement, DISH managed virtually all aspects of SNR and Northstar's businesses, including engineering and construction of signal towers, marketing, record keeping, and contract negotiations. *See id.* at 8897-98, 8919. Their businesses operated under DISH's trademark, for which they paid royalties to DISH. *Id.* at 8899.

The parties' agreement left SNR and Northstar no practical means of ensuring that DISH would use those managerial powers to further SNR and Northstar's own goals rather than DISH's. *See id.* at 8898-8901. While SNR and Northstar were ostensibly in charge of setting their business objectives, DISH required them to consult it on every important aspect of their business plans. *Id.* at 8920. And SNR and Northstar had extremely strong incentives to follow any suggestions that DISH made during the planning process: As explained further below, DISH had almost complete control over SNR and Northstar's owners' compensation; if DISH felt that it was being ignored during the business planning process, it could command compliance from SNR and Northstar by limiting that compensation. *See id.* at 8920.

Moreover, the process SNR or Northstar would have to navigate if they ever wished to replace DISH with a different operations manager would be prohibitively time-consuming and costly. *See id.* They could terminate their Management Services Agreement (MSA) with DISH only after completing a "complex, costly, and lengthy process, culminating in arbitration," in which they would have to establish that DISH committed a material breach of the Management Services Agreement. *Id.* Termination of the MSA without cause would require them to give DISH 12 months' notice and repay the billions of dollars that they borrowed from DISH to purchase the licenses at an interest rate several points higher than the rate they would otherwise owe. *Id.* at 8921. Thus, the FCC concluded that SNR and Northstar did not have meaningful control over the day-to-day operation of their businesses.

Moving to the second *Intermountain Microwave* factor, the FCC determined that SNR and Northstar had little control over their employment decisions. *See id.* at 8921-23. DISH had the power to appoint the "Systems Manager" for each

company, as the single point of contact with DISH as Operations Manager, and such individual would not be selected by SNR and Northstar but only need be "reasonably acceptable" to them. *Id.* at 8923. The Management Services Agreement for each company purported to give it the "authority and ultimate control over . . . the employment, supervision and dismissal of all personnel providing services." *Id.* at 8923. But the Commission found that authority was illusory because SNR and Northstar each received only a very modest budget each year. *Id.* at 8922. Those sums did not enable SNR and Northstar to hire sufficient personnel to "effectively oversee operations." *Id.* Instead, SNR and Northstar hired scant staff, relying primarily on DISH—as the Operations Manager—to staff SNR and Northstar's operation. *Id.* Neither SNR nor Northstar could offer any employee compensation in excess of $200,000 per year without DISH's permission, giving DISH a veto over hiring decisions for any top executive. DISH meanwhile retained unilateral authority to set its own compensation as the small companies' Operations Manager, subject only to "consultation and direction" from SNR and Northstar. *Id.* The Commission found the compensation arrangement "not compatible with the Applicants' actually having the ability to manage and operate their businesses." *Id.* at 8923.

With respect to the third *Intermountain Microwave* factor, the FCC found that SNR and Northstar did not have "unfettered access to their facilities and equipment." *Id.* at 8934. When the auction took place, SNR and Northstar did not yet have facilities, but the text of the agreements between SNR, Northstar, and DISH recited that SNR and Northstar would have "unfettered use of, and unimpaired access to, all facilities and equipment associated with [their] [s]ystems." *Id.* The Commission found that language belied by other contractual provisions that gave DISH the right to choose the type of

wireless service that SNR and Northstar would offer. *Id.* at 8935.

Because the agreements barred SNR and Northstar from using their facilities to provide any service that was incompatible with DISH's service, and DISH had neither specified the service it planned to develop nor had any current plans to build out its own spectrum, the FCC believed that SNR and Northstar did not have "unfettered use" of their facilities. *Id.* (citing *Ellis Thompson I*, 9 F.C.C. Rcd. 7138, 7140). Petitioners tellingly point out that small providers typically must gear their facilities to their investor's favored technology in order to provide a competitive scope of service. Pet'r Br. 44. The Commission itself has acknowledged the benefits to small providers of "an assurance of basic interoperability," with which small providers "will face less uncertainty over the development of a healthy device ecosystem," and has encouraged voluntary measures to facilitate interoperability. *Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands*, 29 F.C.C. Rcd. 4610, 4698-99 (2014). The FCC's distinction between other designated entities' command of their facilities and petitioners' lack of choice thus strikes us as relatively thin, resting principally on the risk that petitioners' agreement to interoperate with DISH's yet-to-be-chosen network could prevent them from prompt development of their own spectrum. But our review is deferential, and we conclude that the Commission permissibly found this factor to further demonstrate DISH's control over SNR and Northstar.

Turning to the fourth *Intermountain Microwave* factor, the FCC found that DISH also "dominate[d] the financial aspects of SNR's and Northstar's businesses." *Id.* at 8924. DISH "provided equity contributions and loans to the [petitioners]

that account[ed] for approximately 98 percent of the [petitioners'] winning bid amounts and . . . further agreed to provide all future funds for build-out and working capital." *Id.* In addition, SNR and Northstar could not acquire more than $25 million in debt from sources other than DISH. *Id.* The FCC believed any such sum was necessarily "trivial" in comparison to what it would cost to build and use a nationwide wireless network. *Id.*

The FCC also found that the fifth *Intermountain Microwave* factor, regarding the allocation of profits from SNR and Northstar's business, "firmly raise[d] the specter of control." *Id.* at 8925. The FCC explained:

> A preliminary review of the Agreements reflects that the profits generated by SNR's and Northstar's operations are to be distributed *pro-rata* in accordance with the ownership interests of the parties. When examined alone, these provisions appear to be conventional cash collection and profit distribution arrangements. However, when considered in conjunction with other provisions in the Agreements that dictate the distribution of revenues received, we find that the business arrangements between the parties are structured in such a way that the profits are likely only to benefit DISH.

*Id.* Notably, before realizing any profits from their business operations, SNR and Northstar would first have to repay the billions of dollars in loans they owed to DISH. *Id.* And, given that SNR and Northstar would need to undertake extensive construction before they could begin providing wireless service, it was very unlikely for the foreseeable future that they would be able to repay those loans and begin earning profits. *Id.*

With respect to the sixth and final *Intermountain Microwave* factor, the FCC concluded that DISH made every essential policy decision for SNR and Northstar's businesses, including decisions about: (a) the type of wireless technology that SNR and Northstar would use; (b) the number of spectrum licenses that SNR and Northstar would hold; (c) the timetable for SNR and Northstar to build networks and begin offering services to customers; (d) when SNR and Northstar might sell their businesses; (e) whether SNR and Northstar could own real property; and (f) SNR and Northstar's bidding strategy. *See id.* at 8927-34. Despite petitioners' claims that DISH "is a purely passive investor," *id.* at 8894, the FCC reasonably concluded that DISH effectively controlled SNR and Northstar's businesses. *See id.* at 8927-34.

The thrust of the Commission's *Intermountain Microwave* analysis was that the petitioners wrote into their contracts general terms that formally spoke to the six factors in ways that seemed to promise SNR and Northstar's independence, but at the same time functionally belied those promises with specific contract terms empowering DISH to control and benefit from virtually all critical aspects of SNR and Northstar's businesses. What mattered, in the Commission's analysis, was the substance of the terms of DISH's control, not the formal recitations of compliance with *Intermountain Microwave*'s six control factors. Such pragmatic application of *Intermountain Microwave* comports with other FCC cases, in which the Commission has emphasized that "[t]he *de facto* control issue 'transcends formulas, for it involves an issue of fact which must be resolved by the special circumstances presented.'" *In re Stratos Glob. Corp.*, 22 F.C.C. Rcd. 21328, 21343 (2007) (quoting *In re Application of Fox Television Stations, Inc.*, 10 F.C.C. Rcd. 8452, 8514 (1995)). We therefore conclude that the FCC's application of the *Intermountain Microwave* test was reasonable and consistent with existing law.

### 3. *Fifth Memorandum Opinion & Order*

Together with its *Intermountain Microwave* analysis, the FCC considered whether DISH had *de facto* control of SNR and Northstar under the FCC's *Fifth Memorandum Opinion & Order*, the Commission's 1994 opinion resolving petitions for reconsideration and clarification of competitive bidding rules for broadband and personal communication service (PCS). *See FCC Op.*, 30 F.C.C. Rcd. at 8929-31 (citing *Fifth MO&O*, 10 F.C.C. Rcd. 403 (1994)).

The *Fifth MO&O* gave additional guidance on the statutory and regulatory provisions that aimed "to ensure that designated entities," such as small, rural, or minority- or women-owned businesses, "have the opportunity to obtain licenses at auction as well as the opportunity to have meaningful involvement in the management and building of our nation's broadband PCS infrastructure." 10 F.C.C. Rcd. 403, 404. Its provisions seek to benefit only those small businesses that plan to participate in the wireless industry themselves, not those that are either proxies for larger investors or plan to become their subsidiaries.

The *Fifth MO&O* specifies that, when an investor "financially . . . force[s]" a small company "into a sale (or major refinancing)," the investor's conduct effects "a transfer of control." *Id*. at 456. As noted above, SNR and Northstar contractually agreed to use the same type of wireless technology as DISH. Nevertheless, at the time of the auction, DISH had no plans to choose a technology or begin building a network. *See FCC Op.*, 30 F.C.C. Rcd. at 8930 & n.312. Thus, SNR and Northstar would have to wait for DISH to make a technology choice before they could start building wireless towers. Even if DISH made that choice very quickly, SNR and Northstar would be unlikely to be able to build a wireless

network and generate enough revenue to repay their multi-billion dollar loans to DISH before the seven-year deadline passed.

DISH also imposed financing obligations and transfer restrictions on SNR and Northstar:  Neither small company could borrow more than $25 million dollars from other sources to help repay DISH, *id.* at 8924, nor could it sell its business (*e.g.* to a wealthier entity that might be able to shoulder a large debt) without DISH's consent, *see id.* at 8928-29 (explaining that DISH had authority for ten years to freely block the sale of SNR or Northstar, after which the companies could be sold, but only subject to DISH's right of first refusal).  Consequently, if SNR or Northstar sought to act independently of DISH to actually build its own wireless business, as opposed to merely collecting its assured payment from DISH, it was doomed to default on its loans.  *See id.* at 8929.  Moreover, the loans were so large that defaulting could "reduce the value of the membership interests in [SNR and Northstar] to zero."  *Id.* at 8930.

The Agreements left SNR and Northstar only one path to avoiding certain financial failure:  Five years after acquiring their spectrum licenses, they each had a "put," *i.e.*, a right to require DISH to buy their business for the price of "their investment . . . together with an annual rate of return" that was specified under seal in the contract.  *Id.* at 8929.  The contract limited SNR and Northstar to a 30-day window at the end of the fifth year to exercise that option.  *See FCC Op.*, 30 F.C.C. Rcd. at 8929.  Such a relatively generous but fleeting, one-time-only opportunity was virtually certain to entice SNR and Northstar to sell their companies to DISH.  *Id.* at 8930.  And that financial carrot would appear at a convenient time for DISH:  FCC rules provide that, five years after a designated entity acquires a spectrum license—but no sooner—it can sell

its business to a large company without paying a penalty to the Commission. *See id.* at 8897 n.82 (citing 47 C.F.R. § 1.2111(d)(2)(E)). Thus, the FCC determined that SNR and Northstar would have every interest in selling their businesses to DISH at the first possible moment. *See id.* at 8931 (citing *Fifth MO&O*, 10 F.C.C. Rcd. 403, 456). Such terms may be mutually beneficial to the parties to the agreements, but they are hardly what one would expect if SNR and Northstar wished to build their own independent wireless businesses.

The FCC's conclusion is strongly supported by the *Fifth MO&O*, which provided the following example of an arrangement that could constitute a transfer of control:

> [If] an agreement between a strategic investor and a designated entity provides that (1) the investor makes debt financing available to the applicant on very favorable terms (e.g., 15 year-term, no payments of principal or interest for six years) and (2) [] the designated entity has a one-time put right that is exercisable at a time and under conditions that are designed to maximize the incentive of the licensee to sell (e.g., six years after issue, option to put partnership interest in lieu of payment of principal and accrued interest on loan), we may conclude that *de facto* control has been relinquished.

*Fifth MO&O*, 10 F.C.C. Rcd. 403, 455-56. The facts in that example are materially identical to the facts here. Here, as in the example, a strategic investor has provided financing to small companies on very favorable terms (no payments of principal or interest for five years) and the small companies have a "one-time put right that is exercisable at a time and under conditions that are designed to maximize the incentive of the licensee to sell" (including by providing that the right

can be exercised "in lieu of payment of principal and accrued interest on loan"). We therefore conclude that the *Fifth MO&O* clearly presaged the FCC's *de facto* control finding, and that the FCC applied the *Fifth MO&O* in a reasonable manner to support its conclusion.

### 4. The Wireless Bureau's Allowance of Bidding Credits to Denali Spectrum and Salmon PCS is Not Controlling

The petitioners do not dispute the authoritative guidance provided by the controlling-interests rule, 47 C.F.R. § 1.2110(c)(2)(ii)(H), *Intermountain Microwave*, and the *Fifth MO&O*. Their petition rests largely on the assertion that the FCC's analysis, however consistent with those authorities, cannot be squared with what they view as the more specific guidance provided by two Wireless Bureau actions approving applications Denali Spectrum and Salmon PCS filed for designated-entity bidding credits. Petitioners characterize the Bureau's approval of those applications as inconsistent with the Commission's denial of theirs.

Each of the two applications for small-business credits that petitioners highlight was approved by the Bureau with a one-word action communicating that the application was "granted," without any opinion or explanation. Petitioners nonetheless insist that those actions have precedential force, requiring the Commission to approve similar applications. They contend their applications are materially identical, so the FCC's denials were contrary to its own precedent and constituted an unexplained change of course.

While the absence of a written opinion regarding either Denali Spectrum or Salmon PCS's successful application for bidding credits makes it somewhat difficult to discern the relevant terms, we disagree with SNR and Northstar that those

actions require us to grant their petitions. Under our established precedent, the unexplained approvals of small-business credits to Denali and Salmon are non-precedential and, even examining their substance, do not detract from the FCC's decision here.

### i. The Denali and Salmon Approvals Are Non-Precedential

Publicly available documents contain some of the background information that likely informed the Bureau's Denali and Salmon approvals. More than a decade ago, Cricket Communications, Inc. and its affiliates (collectively, Cricket) acquired an eighty-five percent interest in a small business called Denali Spectrum and provided the capital that Denali Spectrum needed to participate in a wireless spectrum auction.[5] Cricket also agreed to serve as Denali Spectrum's manager.[6] The Wireless Bureau granted Denali Spectrum's request for small business credits without opinion.[7]

---

[5] *See* FCC Universal Licensing System, Application File No. 0002774595,
http://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAtta
chments.jsp?applID=3937783 (click on "Organization Chart" hyperlink, created March 23, 2007); *see also id.* (click on "Exhibit D: Agreements and Other Instruments" hyperlink, created April 18, 2007).

[6] *See id.* (click on "Exhibit D: Agreements and Other Instruments" hyperlink, created April 18, 2007).

[7] *See* FCC Universal Licensing System, Application File No. 0002774595,
http://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAtta
chments.jsp?applID=3937783; *see also id.* (click on "Exhibit C: Designated Entities" hyperlink, created March 23, 2007).

Cingular Wireless similarly obtained an eighty-five percent stake in a small business called Salmon PCS.[8] Cingular served as Salmon's manager and had a right to weigh in on many aspects of Salmon's business.[9] Yet the Wireless Bureau treated Salmon as an independent small business, allowing it to use bidding credits to offset the cost of a spectrum license.[10] As with Denali, the Wireless Bureau did not explain why it believed Salmon qualified as a designated entity.

The core of petitioners' case rests on their decisions to model many of the provisions in their agreements with DISH on contractual provisions between small businesses and their larger investors that the Wireless Bureau had previously accepted as not evidencing disqualifying *de facto* control. In particular, petitioners contend that material terms of the agreements between DISH and petitioners track terms of Cricket's agreements with Denali Spectrum or Cingular Wireless's agreements with Salmon PCS. *See* Pet. Br., App'x A (comparing the contractual agreements in *Denali* with the contractual agreements in this case). Thus, the petitioners contend, the FCC necessarily departed from precedent when it held that DISH—unlike the investors in Denali Spectrum and Salmon PCS—exercised *de facto* control over the small companies it was managing. We are not persuaded.

---

[8] *See* FCC Universal Licensing System, Application File No. 0000365189, http://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAtta chments.jsp?applID=1575639# (click on "Exhibit A: Ownership" hyperlink, created February 11, 2001).
[9] *See id.* (click on "Management Agreement" hyperlink, created September 18, 2001).
[10] *See id.*; *see also id.* (click "Exhibit D: Designated Entities" hyperlink, created February 12, 2001).

As an initial matter, there is no evidence that the FCC has changed its position. The FCC is not bound to treat the provisions of agreements filed with a pair of long-form applications, which the Wireless Bureau administratively granted without opinion or any public statement of reasons, as if those provisions established a Commission position from which it could not deviate without reasoned explanation. *See Fox I*, 556 U.S. at 515; *State Farm*, 463 U.S. at 41-42. We have no assurance that the Commission ever accepted those decisions as correct even on their own terms, nor even that the Commission scrutinized the details of the filings on which petitioners now claim to rely.

The FCC did not unreasonably "disavow" its staff-level actions. This court has repeatedly held that a "lower component of a government agency" does not bind the agency as a whole. *Comcast*, 526 F.3d at 769 (collecting cases). In *Comcast*, we "reaffirmed our well-established view" that the reasoning behind unchallenged Media Bureau actions cannot be attributed to the agency unless and until "the agency has . . . endorsed those actions." *Id.* (quoting *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004)). The Wireless Bureau's acceptance of Denali's and Salmon's applications for designated-entity bidding credits did not require the Commission to follow the same approach or explain why it did not do so for SNR and Northstar.

The petitioners make a range of arguments that the FCC was bound to grant bidding credits to them because the Wireless Bureau approved credits in cases they assert are materially indistinguishable. First, the petitioners argue that the Wireless Bureau has the delegated authority to act for the Commission on matters within the Bureau's purview, including implementing the Commission's auction rules. 47 C.F.R. § 0.131; *In re Amendment of Part 1 of the Commission's*

*Rules—Competitive Bidding Proceedings*, 12 F.C.C. Rcd. 5686, 5697-98 (1997). Because the Wireless Bureau's exercises of delegated power have "the same force and effect . . . as orders, decisions, reports, or other actions of the Commission" as a whole, 47 U.S.C. § 155(c)(3), the petitioners assert that Bureau decisions regarding designated entities should be considered full Commission decisions. That is true enough as far as it goes. But it "simply means that [Bureau] rulings are binding on the parties to the proceeding." *Comcast*, 526 F.3d at 770. It most assuredly does not mean that principles one might glean from unexplained, case-specific Bureau actions—whether granting individual waivers as in *Comcast*, or applications for designated-entity status to particular applicants such as Denali Spectrum or Salmon PCS—are somehow to be treated as establishing the position of the Commission.

Second, the petitioners contend that Wireless Bureau actions must be considered Commission precedent under 47 C.F.R. § 0.445. That regulation provides that, when "[a]djudicatory opinions and orders of the Commission, or its staff acting on delegated authority" are "published in the Federal Register, the FCC Record, FCC Reports, or Pike and Fischer Communications Regulation," then they may be "relied upon, used or cited as precedent by the Commission or private parties in any manner." 47 C.F.R. § 0.445(a), (f). By contrast, where the "[a]djudicatory opinions and orders of the Commission, or its staff acting on delegated authority" are not so published, they only may "be relied upon, used or cited as precedent . . . against persons who have actual notice of the document in question or . . . against the Commission." *Id.* § 0.445(a), (f). The petitioners contend the unpublished Wireless Bureau staff orders are precedential under Section 0.445 when cited "against the Commission."

Even assuming that the Wireless Bureau's actions approving Denali Spectrum and Salmon's applications for bidding credits may properly be considered "[a]djudicatory opinions and orders"—a proposition not established— petitioners' argument is unpersuasive:  The point of Section 0.445 is to prevent use of any documents against a party, including the Commission, that lacks actual notice of it. Section 0.445 does not speak to the weight any particular document has when "used or cited."

Third, *Comcast* dealt with "sporadic action" by the Media Bureau, which was "neither reviewed nor endorsed" by the Commission as a whole; petitioners would have us differentiate this case on the ground that the full FCC itself has referred to Wireless Bureau actions "to establish the position of 'the Commission.'"  Pet'r Br. 34, 40.  But the Denali and Salmon decisions, as only two among many dozens of actions on applications for designated-entity credits, were also "sporadic" actions that the Commission neither reviewed nor endorsed. Petitioners grasp at the straw of the Commission's citation to Bureau opinions in support of its standing analysis in the challenged order as if that tacitly endorsed every Bureau action. *See FCC Op.*, 30 F.C.C. Rcd. at 8905 nn.153-54.  Just as this court would not, by citing one of its own unpublished judgments in a published opinion, somehow thereby convert all of our unpublished judgments into binding circuit precedent, so the FCC's citation to a Wireless Bureau opinion does not mean the Commission has tacitly embraced all Wireless Bureau actions.

Fourth, the petitioners suggest that the FCC has an obligation to follow Wireless Bureau precedents, at least in this case, because the Auction Notice "directed auction participants to Bureau precedent for 'further guidance' on the specific question of control."  Pet. Br. 11.  But the Auction Notice

identified three specific sources for guidance on the issue of *de facto* control. *Auction Notice*, 29 F.C.C. Rcd. at 8412 & n.151. One of those sources, the *Baker Creek* Memorandum Opinion and Order, was a Wireless Bureau decision—albeit one that the full Commission had already endorsed on multiple occasions. *See, e.g.*, *In re Stratos Glob. Corp.*, 22 F.C.C. Rcd. at 21343 n.107; *In re Application of Bollinger*, 16 F.C.C. Rcd. 18107, 18110 n.9 (2001); *Amendments*, 15 F.C.C. Rcd. at 16970 n.251. No reasonable auction participant could read the Notice's reference to *Baker Creek* as the Commission's general announcement of a commitment to embrace every principle any party might glean from a past Wireless Bureau action.

Fifth, the petitioners note that the FCC took care in this case to "disavow" Wireless Bureau staff actions, which they contend implies those actions otherwise would count as full Commission actions. The "disavow[al]" appeared in a footnote, where the FCC stated:

> To the extent any prior actions of Commission staff could be read to be inconsistent with our interpretation of the Commission's rules in this order, those actions are not binding on the Commission—and we hereby expressly disavow them as inconsistent with the goals of Section 309(j)(3), the text and purpose of Section 1.2110 of the Commission's rules, and Commission policy as embodied in the *Fifth MO&O*, this decision, and other decisions of the Commission described above. *See Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008); *accord*, *Comcast Cable Communications, LLC[] v. FCC*, 717 F.3d 982, 1002 (D.C. Cir. 2013) [Edwards, J., concurring].

*See FCC Op.*, 30 F.C.C. Rcd. at 8937 n.354. The statement itself is quite explicit that staff actions "are not binding on the

Commission." Only then, to foreclose any inconsistency that—reasonably or not—"could be read" into past staff actions, did the Commission "disavow" any contrary understanding and specify the particular statutory provision, rules, and FCC orders to which potential designated entities should look for guidance. That simple reiteration does not carry the powerful negative implication petitioners would have us draw from it.

The sixth reason that petitioners say the Commission unreasonably found *de facto* control where petitioners had tracked Wireless Bureau-approved applications is that the petitioners had no other choice: If copying terms of agreements of designated entities the Wireless Bureau had approved did not require Commission approval, petitioners contend, what would? The petitioners disparage the regulations as providing "*zero* guidance about what does and does not constitute de facto control in the auction context." Pet'r Reply Br. 10. They complain that *Intermountain Microwave*'s factors also "fail[] to provide clear guidance," and the *Fifth MO&O*'s discussion of when a large company has *de facto* control over an affiliate amounts to only "general admonitions." *Id*. at 11. Thus, the petitioners conclude, the FCC must have intended them to look to the specific application forms and underlying agreements of businesses—such as Denali Spectrum and Salmon PCS—that the Wireless Bureau treated as designated entities entitled to bidding credits.

The petitioners have not cited any case suggesting that, when application of an agency's standard—here, *de facto* control—takes into account a wide range of different types of evidence, the agency cannot act reasonably unless it follows its staff action. To be sure, where a standard itself does not give notice of the conduct it prohibits, a regulated entity cannot be *punished* for violating those standards. *See, e.g.*, *Abhe &*

*Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1060 (D.C. Cir. 2007); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). We have more to say below about the question of fair notice. But the Commission remained free to determine on the facts that petitioners do not in fact qualify for bidding credits, even though its governing criteria were context-dependent.

Finally, petitioners contend that the Commission's denial of bidding credits was contrary to law because "agencies cannot pretend that informal agency guidance does not exist in considering whether regulated parties conformed their conduct to the law." Pet'r Reply Br. at 17. They invoke the Supreme Court's reference in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 247 (2012) (*Fox II*), to "*unpublished* Bureau-level decisions," as if that recognition invalidates the FCC's decision here for failure to conform to the Wireless Bureau's past actions. Pet'r Reply Br. at 17. But that miscasts the role of the Bureau rulings in *Fox II*. The Court held that Bureau rulings, together with the Commission's rulings and letters on fleeting expletives and nudity, were not consistent and specific enough to provide advance notice of the challenged penalty. *See Fox II*, 567 U.S. at 256-57. *Fox II* does not support treating FCC Bureau decisions as themselves a body of precedent from which the Commission may not deviate without explanation.

The FCC need not follow—or explain its departures from—Wireless Bureau decisions. The Commission is not required to approve applications for bidding credits just because the applicants modeled terms of their investor contracts on terms used by designated-entity applicants the Wireless Bureau approved. When we consider whether the FCC's *de facto* control rules were clear enough that petitioners should have expected that, were they to fall short they would be penalized for default and denied an opportunity to cure, *see*

*infra*, Section II.B, we will take note of the way that Wireless Bureau staff seemed to interpret those rules.

### ii. The Denali and Salmon Applications Were Materially Different from Petitioners'

Even were we to accept the petitioners' assertions that they reasonably relied on Wireless Bureau grants of certain past applications as if they were authoritative precedents, the FCC permissibly determined that the applications in Denali and Salmon were not on all fours with SNR and Northstar's. Those agreements were different enough that petitioners were on notice that they might be disqualified even where the prior designated-entity applicants on which they had sought to model themselves had been approved. At the same time, it does not appear that the agreements were so different that petitioners could have been expected to anticipate that they would be denied an opportunity to negotiate a cure.

SNR and Northstar place great emphasis on their compliance strategy whereby DISH pulled various contractual provisions out of the Denali and Salmon agreements and stitched them together to form its contracts with petitioners here. Whatever the extent of overlap between terms of petitioners' contracts and terms in one or another of those prior applicants' contracts, the FCC reasonably found that the resulting relationship between the petitioners and DISH manifests impermissible control more plainly than did the relationships between Cricket and Denali, or between Cingular Wireless and Salmon.

Notably, in this case, it is clearer that SNR and Northstar will be "financially . . . force[d]" to sell their businesses to their largest investor, DISH. *See Fifth MO&O*, 10 F.C.C. Rcd. 403, 456. As explained above, instead of scrambling to build a national network in the space of less than five to seven years in

the quixotic mission of generating enough revenue to pay back their multibillion dollar loans, the petitioners have every incentive simply to sell their interests at year five to DISH in exchange for complete forgiveness of those loans plus a guaranteed cash payment.

Denali Spectrum's situation was markedly different. It was not clearly foreordained that Denali would sell its business to Cricket. Denali only needed to use one license to provide service in the Chicago area—rather than hundreds of licenses to provide an integrated national network.[11] Denali also had ten years—rather than five—to build its comparatively small-scale service before it had to make its first loan payment, and it had fourteen years—rather than seven—to finish paying off its loans.[12] Denali's chances of establishing a network and turning a profit before it had to start paying back its loans were thus substantially greater than SNR or Northstar's.

At the same time, under their agreement with DISH, SNR and Northstar faced more powerful temptation to sell their businesses to DISH at the earliest permissible time. The agreements enabled SNR and Northstar "to require DISH to

---

[11] *See* FCC Universal Licensing System, Application File No. 0002774595,
http://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMarketSum .jsp?applID=3937783.

[12] *See* Credit Agreement By and Among Cricket Communications, Inc. (as Lender) and Denali Spectrum License, LLC (as Borrower) (July 13, 2006),
https://www.sec.gov/Archives/edgar/data/1065049/0000936392060 00773/a22231exv10w15.htm, *as amended by* Amendment No. 2 to Credit Agreement By and Among Cricket Communications, Inc. (as Lender) and Denali Spectrum License, LLC (as Borrower) (April 16, 2007),
https://www.sec.gov/Archives/edgar/data/1065049/0000936392070 00409/a30090exv10w5w2.htm.

purchase their interest," subject to few conditions. *FCC Op.*, 30 F.C.C. Rcd. at 8929. By contrast, Cricket had not promised to buy Denali Spectrum's business; rather, Cricket "ha[d] the right, but not the obligation," to accept an offer from Denali Spectrum to sell its spectrum.[13] Thus, neither the carrots nor the sticks in *Denali* were as large as those that collectively pressure SNR and Northstar to sell their businesses to DISH.

The business arrangements in this case were also more likely to induce a buyout—rather than network development by the designated entities—than those between Salmon and Cingular. Salmon's Management Services Agreement with Cingular contained a detailed and speedy timeline for building the facilities that Salmon would need in order to provide wireless service to customers.[14] If Cingular did not adhere to the timeline, Salmon had the right to "take any and all action necessary[,] . . . including retaining third parties" to provide services in lieu of Cingular; Cingular would then have an obligation to reimburse Salmon for the reasonable cost of those third-party services.[15] Salmon, like Denali Spectrum, thus had significantly more control and realistic opportunity than SNR or Northstar to build a wireless network and begin collecting revenues before its loans were due. Moreover, Salmon's controlling investor had three different opportunities to sell its

---

[13] *See* FCC Universal Licensing System, Application File No. 0002774595, at 15, http://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAtta chments.jsp?applID=3937783 (click on "Exhibit D: Agreements and Other Instruments" hyperlink, created April 18, 2007).

[14] *See* FCC Universal Licensing System, Application File No. 0000365189, http://wireless2.fcc.gov/UlsApp/ApplicationSearch/applAdminAtta chments.jsp?applID=1575639# (click on "Management Agreement" hyperlink, created September 18, 2001).

[15] *See id.* at 23.

interest in Salmon to Cingular.[16] It therefore had more chances to see how Salmon's business was progressing before it made a decision to keep or sell its shares; by contrast, SNR and Northstar had just a single, 30-day window (during the fifth year of the venture) to sell their businesses to DISH. Under these circumstances, the petitioners cannot reasonably claim that they were in the same position as Salmon.

In addition to the terms setting up a forced buyout more clearly here than in Denali or Salmon's circumstances, SNR and Northstar's bidding behavior was suspicious in ways that Denali's and Salmon's were not. As the FCC noted in its decision, SNR and Northstar's bidding conduct suggested that the two entities—although ostensibly separate and independent—were not in fact competing with one another. *See FCC Op.*, 30 F.C.C. Rcd. at 8932-33. To the contrary, they seemed to be working toward the same goal, and indifferent as to which entity paid to achieve it. *See id.* The Commission emphasized, for example, that,

> [C]ontrary to its own independent economic interest, SNR withdrew a bid in round 238 that had been a provisionally winning bid since round 77, an action that resulted in its being liable for an $11 million withdrawal payment ($8 million if adjusted for bidding credits). In the next round, Northstar was able to benefit by SNR's withdrawal to become the provisionally winning bidder for that license at a price $11 million less than SNR's prior bid ($8 million less if adjusted for claimed bidding credits). . . . Accordingly, while the switch added $11 million to SNR's balance sheet to the detriment of its non-DISH

---

[16] *See id.* at 26 (click on "LLC Agreement" hyperlink, created September 18, 2001).

owners, it was an economic "wash" to the combined [petitioners] . . . .

*Id.* at 8933. SNR and Northstar have not established that they had any joint venture or shared business with each other that could explain their a-symmetric cooperation during bidding as reflecting anything other than their control by DISH. At oral argument, their counsel asserted that they did have some shared ventures, but we find no evidence in the record to support that assertion. The only contractual agreement in the record that was signed by SNR *and* Northstar was the joint bidding agreement. That agreement suggests that SNR and Northstar wanted to coordinate their bids with DISH so that the three companies could combine their products and services to the extent contemplated by their governing agreements. But the governing agreements refer to SNR and Northstar as if they are separate companies who just happen to have the same business manager and financial backer (DISH). Without any other explanation for their non-mutually-beneficial bidding, the FCC reasonably concluded that SNR and Northstar were acting as two arms of DISH, working together to advance DISH's goals. *Id.* at 8932-33.

SNR and Northstar respond that the bidding agreement between SNR, Northstar, and DISH was not materially different from the bidding agreement between Denali and Cricket. But no case that petitioners have identified involved two ostensibly distinct small businesses coordinating their bidding with one another to favor one and disadvantage the other, even while jointly achieving a net benefit. That is the situation we confront here. SNR and Northstar also argue that they should not be penalized because their bidding behavior did not violate any FCC bidding rules. But behavior not itself barred by FCC rules may nonetheless be probative of impermissible control. *Cf. Baker Creek*, 13 F.C.C. Rcd. 18709,

18724 (explaining that a particular type of partnership agreement was "permissible" under FCC rules, but "also relevant" to the FCC's control analysis). In the absence of any contractual provisions that would, for example, share the net benefits of coordinated bidding where losses to one firm are offset by gains to the other, the joint bidding strongly suggests that each petitioner was an arm of DISH. Unless both companies were controlled by DISH, SNR and Northstar's unusually cross-subsidizing bidding behavior is inexplicable from a business perspective.

Thus, under the totality of the circumstances, we believe that the FCC acted reasonably and consistently with its Wireless Bureau's decisions when it held that DISH had *de facto* control over SNR and Northstar.

The petitioners argue lastly that, even if the FCC's decision could be harmonized with FCC and Wireless Bureau precedents, the Chairman of the FCC told Congress that it was not in fact applying those precedents to resolve this case, but applied new auction rules that it developed in the wake of Auction 97. Petitioners claim that it is arbitrary to penalize them for failing to predict and comply with rules that were not yet on the books. But the Chairman's testimony is sufficiently ambiguous where the order itself is clear that it does not carry the weight petitioners assign it.

The Chairman made the following statement about the *de facto* control standard that the FCC would use to determine whether DISH controlled SNR and Northstar:

> [W]e [are] us[ing] a totality of [the] circumstances test that ha[s] never been applied before to say, we don't think that that is a good idea, at a staff level. [SNR and Northstar's case] is coming to the Commission, so,

again, I have to rule on that, so I won't go any further. But the fact of the matter is that we [have taken] that totality of the circumstances [test] and put it into the [designated entity] rules in this re-write that we just did.[17]

While that testimony is not entirely clear, it affirms the FCC's commitment to the "totality of the circumstances" test as a useful way to determine whether a designated entity is independent or under another's control, so the agency incorporated the test into the most recent "re-write" of its rules. The testimony is hardly crystalline. The "re-write" to which Chairman Wheeler apparently refers added helpful specificity to the applicable rules, including a cap on bidding credits, that was lacking at the time of SNR and Northstar's applications.

Whatever the statement was supposed to mean, "agency opinions, like judicial opinions, speak for themselves." *PLMRS Narrowband Corp. v. FCC*, 182 F.3d 995, 1001 (D.C. Cir. 1999) (internal quotation marks and brackets omitted). So, too, the Commission's rules. Contrary to petitioners' contention, the Chairman's somewhat opaque statement—viewed in context with the rules, the "re-write," and the FCC opinion in this case—is not an admission that the Commission planned to depart from its precedents and apply wholly new rules to petitioners. The FCC opinion refers to and reasonably applies rules and precedents, all of which pre-date the conduct at issue.

---

[17] Continued Oversight of the Federal Communications Commission: Hearing before the Subcomm. on Commc'n of the H. Comm. on Energy and Commerce and Tech., 114th Cong., prelim. transcript at 54-55 (July 28, 2015) (testimony of Tom Wheeler, Chairman, Federal Communications Commission), http://docs.house.gov/meetings/IF/IF16/20150728/103819/HHRG-114-IF16-20150728-SD009.pdf.

Nothing in that opinion suggests that the Commission applied novel rules to determine whether DISH had control over SNR and Northstar.

## B. Inadequacy of Notice to SNR and Northstar that the FCC Would Deny an Opportunity to Cure

It is a basic principle of administrative law that an agency cannot sanction an individual for violating the agency's rules unless the individual had "fair notice" of those rules. *Gen. Elec.*, 53 F.3d at 1328; *see also, e.g.*, *Howmet Corp. v. EPA*, 614 F.3d 544, 553 (D.C. Cir. 2010); *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000). Notice is fair if it allows regulated parties to "identify, with ascertainable certainty, the standards with which the agency expects [them] to conform." *Trinity*, 211 F.3d at 628; *accord Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 125 (D.C. Cir. 2014).

The petitioners argue that, even if the FCC reasonably applied its precedents regarding *de facto* control, those precedents did not give them fair notice that their arrangements with DISH might be found to (a) manifest *de facto* control disentitling them to the designated-entity status that qualifies very small businesses for bidding credits, or (b) show such a degree of *de facto* control that the FCC would deny them an opportunity to seek to negotiate any cure. We hold that notice was sufficiently clear as to the first proposition but not the second. Petitioners' arguments and the legal sources upon which they rest are both more readily distinguished and less authoritative on the control question than on the opportunity for cure. The foreseeable adequacy of the legal and factual grounds for the Commission's determination that *these* arrangements manifest DISH's *de facto* control over petitioners did not also make clear that such a control determination and its consequent penalties would be non-negotiable. Indeed, the

very point of an opportunity to cure is to give some cushion to firms that must plan under uncertainty. Although it could well elect to do so, the FCC did not make clear that it would withdraw an opportunity to seek a cure in every instance in which the uncertainty applicants face is not so serious as to itself invalidate the Commission's control holding for lack of notice.

The FCC reasonably applied its rules regarding *de facto* control, but the petitioners are right that there was considerable uncertainty at the time of Auction 97 about the degree of control those rules would tolerate. The Commission has emphasized the flexibility of the *de facto* control test, which must account for "economic realities." *See FCC Op.*, 30 F.C.C. Rcd. at 8889-90. One of those economic realities is that wireless spectrum licenses are expensive, and small companies often need to obtain hundreds of millions of dollars in loans to enable them to participate in spectrum auctions. When an investor like DISH stakes such a large investment on new, small businesses, it often demands extensive protections— including the right to supervise the small businesses closely. The FCC's Wireless Bureau has in the past tolerated extensive supervision without either the Bureau or the Commission finding the *de jure* or *de facto* control that makes an investor's revenues attributable to the would-be designated entity. On these facts, for all the reasons set forth above, petitioners should reasonably have anticipated that the FCC might find them to be under DISH's *de facto* control. But they lacked reasonable notice that, in the event it found *de facto* control, the Commission would deny them an opportunity to cure.

The waters are muddied here in part because the FCC's original control rules predate cellular technology, and "[a] cellular system is far more complex and sophisticated than the simple microwave systems which the Commission had in mind

when it adopted *Intermountain* [*Microwave*]. Switches and cell sites are intricate, multi-million dollar facilities[.]" *In re Application of Ellis Thompson Corp.*, 10 F.C.C. Rcd. 12554, 12556 (1995) (*Ellis Thompson II*). As a practical matter, virtually any small business needs at least the substantial involvement of a larger business to develop successful cellular service. The *Intermountain Microwave* test accounts for those realities through "sufficiently elastic" applications to allow technical experts to advise and support new participants in the market for wireless services. *Id.* (citing *Ellis Thompson I*, 9 F.C.C. Rcd. 7140 n.4). The Commission has sought to leave room for large companies with "broad expertise" to help small providers with a wide variety of "operational functions." *Fifth MO&O*, 10 F.C.C. Rcd. 403, 451.

Perhaps recognizing the economic and technological hurdles facing small companies seeking to break into the wireless services industry, Wireless Bureau staff have in earlier decisions repeatedly read the FCC's *de facto* control rules to permit large investors to exert significant influence over their small business partners. For example, the Wireless Bureau determined that Cingular did not control Denali Spectrum (its small business partner), even though Cingular provided extensive management services to Denali Spectrum, and had the rights to veto Denali Spectrum's expenditures in excess of $10 million; veto deviations of more than ten percent from Denali Spectrum's annual budget; veto Denali Spectrum's decision to pay an employee more than $200,000 per year; provide engineering, construction, advertising, and clerical services for Denali Spectrum; choose a systems manager for Denali Spectrum; and prevent Denali Spectrum from obtaining more than $5 million in loans from other sources. Thus, as in *General Electric*, "confusion" at the ground level "is yet more evidence that the agency's interpretation of its own regulation" failed to provide fair notice. 53 F.3d at 1332. Under the

circumstances, petitioners had little basis on which to anticipate that a Commission that read the *de facto* control standard to prohibit DISH's powerful influence over petitioners would not only deny petitioners bidding credits, but charge them penalties without at least offering them a chance to seek to cure.

The FCC answers that, even though the *Intermountain Microwave* test is flexible, DISH's influence over the petitioners was so complete that they should have known that their arrangements ran so far afoul of the FCC's control rules that there was no reasonable prospect of coming into compliance after the auction. As discussed in detail above, the FCC reasonably concluded that DISH's conduct plainly evidenced a greater degree of control over petitioners than the conduct of entities previously found not to have exercised *de facto* control. But that alone is not sufficient to show that the petitioners had fair notice that they would be denied any opportunity to cure. *Cf. Fox II*, 567 U.S. at 257 (finding that a regulated entity did not have fair notice that its broadcast was indecent simply because the broadcast was more provocative than broadcasts that had previously been approved).

The FCC further argues that, even if the relatively flexible *Intermountain Microwave* test was unclear, the *Fifth MO&O* unequivocally states that forced sales "*will* constitute a transfer of control under our rules," 10 F.C.C. Rcd. 403, 456 (emphasis added), and that petitioners' put rights made it unreasonable for them to expect to avoid a control finding or retain a chance to cure. But the line is not so bright demarcating when the opportunity for a sale mutually desirable to an investor and a designated entity is so alluring that the FCC will deem it "forced." The determination depends on whether the context as a whole reveals the small business to lack any real plan or potential to build wireless service, so merely exists as a sham

for its investor to obtain bidding credits. *See id.* (explaining that the Commission will examine the "totality of [the] circumstances" in each case to determine whether a small company has been forced to sell its business). Petitioners' violation of the "forced sale" rule was not so obvious as to make up for the lack of notice in the regulations, precedent, and Bureau practice that the FCC would deny petitioners a chance to attempt a cure.

*ClearComm* in particular reasonably supports petitioners' assumption that, in the circumstances of this case, if the Commission found them in violation of the control rules they would have a chance to cure. *In re Application of ClearComm, L.P.*, 16 F.C.C. Rcd. 18627 (2001). ClearComm, a designated entity, sought to transfer its licenses to its subsidiary, NewComm Wireless Services, Inc., whose designated-entity status was challenged because NewComm had a powerful principal investor with put rights and an overbearing management agreement. *Id*. at 18627-18631. The Wireless Bureau granted ClearComm's petition for reconsideration and allowed the transfer, subject to modifications negotiated to eliminate the investor's *de facto* control. *Id*. at 18643-44. Importantly, the Commission endorsed *ClearComm* in an appendix to a final rule as "an adjudicatory investigation to prevent companies from circumventing the objectives of the designated entity eligibility rules." *In re Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 F.C.C. Rcd. 4753, 4800 & n. 206 (2006). *ClearComm* thus communicates a Commission-level position regarding the opportunity to seek a negotiated cure in a way that the Bureau's actions regarding Denali and Salmon did not with respect to the merits of the *de facto* control issue.

The FCC's effort to distinguish *ClearComm* is unconvincing. The FCC held that SNR and Northstar were in a position analogous to ClearComm's, and would deserve an opportunity to cure only if they, like ClearComm, had "at all times" been considered valid designated entities. *FCC Op.*, 30 F.C.C. Rcd. at 8489 n.431. But it was NewComm's qualification, not ClearComm's, that was under review; ClearComm itself needed no cure opportunity precisely *because* it had always been qualified as a designated entity. The relevant parallel is between SNR/Northstar and NewComm, each of which sought eligibility as a designated entity, and each of which fell short.

The FCC objects that granting an opportunity to cure here could create an incentives problem, or "moral hazard": There would be little reason for bidders to comply with designated-entity rules in the first place if, when ultimately denied bidding credits post-auction, they are entitled to haggle with the Commission. Nothing in our decision requires the FCC to permit a cure. That choice lies with the FCC. But if the very opportunity to seek one is to be foreclosed, applicants must have clear, advance notice to that effect.

Where, as here, hundreds of millions of dollars are at stake, regulated parties need fair notice of the circumstances in which a finding of *de facto* control will and will not be subject to an opportunity to attempt to negotiate a cure. The FCC's rules and decisions were not clear enough to provide that notice to the petitioners. In sum, we cannot say that the circumstances in which a violation of FCC's control rules would be deemed irreparable were "ascertainab[ly] certain[]" at the time of Auction 97. *Trinity*, 211 F.3d at 628. Petitioners contend that, in the past, the FCC has "compensate[d] for [a] lack of clarity in its control rules" by giving small companies a chance to modify their contractual agreements with large investors, in an

effort to give the small companies enough independence to satisfy the FCC. Pet'r Br. 56-57. Petitioners seek precisely that kind of opportunity to modify their agreements with DISH. *See id.* at 57-58. Because the FCC did not give clear notice that such an opportunity would be denied, we conclude that an opportunity for petitioner to renegotiate their agreements with DISH provides the appropriate remedy here. *See Gen. Elec.*, 53 F.3d at 1329 (explaining that, "in many cases," an agency can alert regulated entities to its interpretation of its own rules by making "efforts to bring about compliance" with the rules before imposing sanctions). We therefore remand this matter to the FCC for further proceedings consistent with our opinion.

*So ordered.*