# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 9, 2020          Decided July 6, 2021

No. 19-7139

UNITED STATES OF AMERICA, EX REL. PAUL A. CIMINO,
AND
PAUL A. CIMINO,
APPELLANT

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00907)

---

*Tejinder Singh* argued the cause for appellant. With him on the briefs was *Daniel H. Woofter.*

*Amanda L. Mundell* argued the cause for *amicus curiae* the United States in support of appellant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Timothy J. Shea*, United States Attorney, and *Charles W. Scarborough*, Attorney.

*Catherine E. Stetson* argued the cause for appellee. With her on the brief were *Jonathan L. Diesenhaus* and *Matthew J. Higgins*.

*Steven P. Lehotsky*, *Tara S. Morrissey*, *James C. Stansel*, *Melissa B. Kimmel*, *Alan Charles Raul*, and *Virginia A. Seitz* were on the brief for *amici curiae* the Chamber of Commerce of the United States of America and the Pharmaceutical Research and Manufacturers of America in support of appellee.

Before: SRINIVASAN, *Chief Judge*, RAO, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Concurring opinion filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: This case involves the False Claims Act ("FCA") and an alleged fraud perpetrated against the Internal Revenue Service ("IRS"). According to relator Paul Cimino, the International Business Machines Corporation ("IBM") violated the FCA by (1) using a false audit to fraudulently induce the IRS to enter into a $265 million license agreement for software the IRS did not want or need, and (2) presenting false claims for payment for software that the IRS never received. The district court dismissed Cimino's complaint, finding that he did not adequately plead his fraudulent inducement and presentment claims.

This appeal requires us to clarify whether causation is an element of fraudulent inducement under the FCA, and if so, what standard governs it. In light of Supreme Court precedents interpreting the FCA to incorporate the common law, we hold that but-for causation is necessary to establish a fraudulent inducement claim under the FCA. We hold that Cimino

plausibly pleaded causation, as well as materiality, and therefore he may proceed with his fraudulent inducement claims on remand. We affirm, however, the dismissal of Cimino's presentment claims because he failed to plead them with the requisite particularity.

I.

Since 1863, the False Claims Act has imposed liability for fraud against the government. Act of Mar. 2, 1863, ch. 67, 12 Stat. 696 (codified as amended at 31 U.S.C. § 3729 *et seq.*). Congress enacted the FCA to "stop[] the massive frauds perpetrated by large contractors during the Civil War." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (cleaned up). Congressional investigations "painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *United States v. McNinch*, 356 U.S. 595, 599 (1958). A person violates the FCA, among other ways, if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the government or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) & (B). A violator faces civil penalties up to $10,000 per claim and treble damages. *Id*. § 3729(a)(1).

The FCA expands who can prosecute fraud against the government by allowing private persons to bring a qui tam action on the government's behalf. *See id*. § 3730(b). These so-called relators "serve as a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009) (cleaned up). The FCA incentivizes relators to come forward

with knowledge of false claims by sharing between ten and thirty percent of any money recovered by the government, with the precise percentage dependent upon the relator's contribution to the suit. *See* 31 U.S.C. § 3730(d).

To commence a qui tam action under the FCA, a relator files his complaint under seal, providing the government an opportunity to investigate the claims and determine whether to intervene. *Id*. § 3730(b)(2). If the government intervenes, it assumes "primary responsibility for prosecuting the action," but if the government declines, the relator may proceed with the case on his own. *Id*. § 3730(c)(1), (c)(3).

This qui tam action began when Paul Cimino filed a complaint alleging that IBM violated the FCA. As a former senior sales representative for IBM, Cimino helped sell software to the IRS. Based on knowledge acquired on the job, Cimino alleged that IBM fraudulently induced the IRS to enter a $265 million license agreement for "unwanted, unneeded" software. J.A. 6 ¶ 1. Because we must accept Cimino's factual allegations as true at the motion to dismiss stage, we recite the facts as he alleges.

Pursuant to a 2007 license agreement, the IRS used IBM's software, paying between $23 and $30 million annually. As the license agreement neared its expiration in 2012, IBM learned that the IRS was not interested in renewing the agreement because it was not using all the software purchased from IBM. For the upcoming tax season, the IRS intended to negotiate an extension only for the software that it needed.

Faced with the possibility of losing significant revenue, IBM allegedly devised a scheme to pressure the IRS into another long-term deal. IBM planned to conduct a "friendly" audit, anticipating that the IRS was overusing the software and

therefore would owe a significant amount in compliance penalties. IBM would then leverage the penalties by offering to waive them in exchange for a new agreement. IBM retained Deloitte LLP to perform the audit.

Contrary to IBM's expectations, Deloitte's initial audit showed the IRS was not significantly overusing the licenses and owed only $500,000 in compliance penalties—a relatively small amount for a contract of this size. IBM never released these audit results to the IRS. Instead, IBM worked with Deloitte to manipulate the results. For example, IBM counted licenses on discontinued servers as in constant use, even though they were never used. Deloitte first presented the number of overused licenses from this manipulated audit to Adam Kravitz at the IRS. Cimino alleged that "Kravitz rejected the audit findings because, in his words, 'IBM cannot substantiate that the IRS is out of compliance.'" J.A. 27 ¶ 88. IBM then manipulated the audit again to show an outstanding $292 million in compliance penalties. IBM shared this number with the IRS, despite the fact that one IBM employee considered the number "ridiculous," and another "was 'not comfortable representing' that number to the IRS." J.A. 28 ¶ 92. In November 2012, IBM presented another audit to Kravitz showing the IRS owed at least $91 million in compliance penalties, but Kravitz again rejected the findings.

Waiting until Kravitz was on vacation in December, IBM approached IRS officials who were "less knowledgeable about the audit." J.A. 34 ¶ 123. Deloitte presented the false audit showing the IRS was overutilizing the software to several IRS officials including Kravitz's boss, Jim McGrane, who served as the IRS's Deputy Chief Information Officer and led the IRS's software acquisitions. A week later, IBM met with McGrane and told him that, if the IRS did not enter the new license agreement, it would owe $91 million and that IBM had

retained lawyers to collect the penalties. But if the IRS entered into a new license agreement, IBM promised to waive the penalties. Chris Schumm, an IBM employee at the meeting, believed "[d]uring the course of his employment" that "the IRS was very concerned and 'scared' of the false" audit and that the audit's "findings were a substantial factor in the IRS's decision to renew the [agreement]." J.A. 36 ¶ 127. After learning about the extent of compliance penalties revealed by Deloitte's audit, McGrane approved a new license agreement in which the IRS agreed to pay IBM $265 million for a period of five years.

Once the new agreement was in place, IBM allegedly did not make good on its promise to waive the compliance penalties. IBM instead disguised the compliance penalties as an $87 million fee for prospective licenses and support, which "were, upon information and belief, never actually provided to the IRS." J.A. 38 ¶ 140. The IRS continued to pay IBM under the license agreement for the next several years, and it paid most of the $265 million contract price. In 2015, the IRS extended the license agreement for another six months at a cost of over $16 million.

Cimino filed his complaint against IBM under seal in June 2013—about six months after the IRS signed the new license agreement. Cimino's amended complaint asserts that IBM violated the FCA in two ways. First, IBM fraudulently induced the IRS to enter the agreement by using the false audit and the false compliance penalties premised upon it. Second, IBM presented false claims when it charged the IRS for prospective licenses it never provided. After a four-year investigation, the government declined to intervene in the case, and Cimino's complaint was unsealed. IBM moved to dismiss.

The district court dismissed Cimino's complaint in full. With respect to fraudulent inducement, the court held that

Cimino had to plead but-for causation, meaning that the IRS would not have entered the agreement but for IBM's false audit. According to the court, Cimino failed to do so because he never alleged that the IRS accepted the false audit's findings. The court also held Cimino failed to plausibly plead the false audit was material to the IRS, because it paid IBM most of the $265 million license agreement and extended the agreement for an additional $16 million despite its knowledge of possible fraud. As for presentment of a false claim, the court again found it implausible that the IRS "sat by idly in the face of" IBM's alleged fraud and paid millions for purportedly nothing in return. J.A. 419. Alternatively, the court held Cimino improperly pleaded this claim because he did not assert that he lacked access to relevant records, as required to plead "upon information and belief."

Cimino timely appealed the dismissal of his complaint. Although it had earlier declined to intervene, the government filed an amicus brief in support of Cimino.

## II.

We begin with Cimino's claim that IBM fraudulently induced the IRS to enter into a new license agreement with IBM. The FCA makes it unlawful to "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1)(A). Under longstanding Supreme Court precedent, a violation of the FCA occurs when a person fraudulently induces the government to enter a contract and later submits claims for payment under that contract. *See U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), *superseded by statute on other grounds*, Act of Dec. 23, 1943, ch. 377, 57 Stat. 608, 609; *see also U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326–27 (D.C. Cir. 2005). Although the text of the FCA

prohibits only false or fraudulent *claims*, the Court has placed a common law gloss on the statute, interpreting it to also prohibit fraudulent inducement. This means that "each claim submitted to the Government under a contract which was procured by fraud" is false "even in the absence of evidence that the claims were fraudulent in themselves." *Bettis*, 393 F.3d at 1326.

Before assessing whether Cimino properly pleaded fraudulent inducement, we must first answer the threshold question of whether causation is required to make out a fraudulent inducement claim, and if so, the proper standard of causation to apply. We hold that causation is required for a fraudulent inducement claim. Our inquiry here focuses on actual causation, which we determine under a but-for standard.

A.

Cimino argues that causation is not required to make out a claim for fraudulent inducement under the FCA.[1] While this circuit has not explicitly addressed the requirement of causation, the nature of the common law tort of fraudulent inducement as well as the Supreme Court's decisions interpreting the FCA make clear that a successful claim for fraudulent inducement requires demonstrating that a

---

[1] In the proceedings below, Cimino waived his argument that causation is not required, but preserved his argument regarding the proper standard for causation. Because we need not determine the standard for causation if causation is not required, we excuse Cimino's waiver and first explain why causation is required for fraudulent inducement.

defendant's fraud caused the government to enter a contract that later results in a request for payment.[2]

At common law, causation is an integral part of fraudulent inducement, which is a species of fraud. "Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to enter a contract." 37 C.J.S. *Fraud* § 111 (June 2021 update); *cf.* 28 WILLISTON ON CONTRACTS § 70:220 (4th ed. July 2020 update). The ordinary meaning of inducement incorporates a causation requirement. To "induce" means to "bring about, bring on, produce, *cause*, give rise to." *Induce*, OXFORD ENGLISH DICTIONARY 888 (2d ed. 1989) (emphasis added). As the government explains, "fraudulent inducement has a built-in causation requirement." Gov't Amicus Br. 12. If a fraudster's misrepresentations do not cause a party to enter a contract, no fraudulent inducement has occurred.

The Supreme Court has recognized that in prohibiting false or fraudulent claims, the FCA in effect incorporated a common law tort along with its common law requirements. In general, "the term 'fraudulent' [in the FCA] is a paradigmatic example of a statutory term that incorporates the common-law

---

[2] The First Circuit has explained that a fraudulent inducement claim under the FCA requires causation. *See D'Agostino v. EV3, Inc.*, 845 F.3d 1, 9 (1st Cir. 2016). Other circuits have implicitly recognized that the requirements of fraudulent inducement include causation. *See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (explaining that fraudulent inducement requires a "fraudulent course of conduct … that *caused* the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')") (emphasis added) (cleaned up); *see also U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009); *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

meaning of fraud." *Escobar*, 136 S. Ct. at 1999; *see also id.* at 1999 n.2 (explaining that "we presume that Congress retained all other elements of common-law fraud that are consistent with the statutory text [when] there are no textual indicia to the contrary"). More specifically, when the Court recognized a claim for fraudulent inducement, it explained that contractors "caused the government to pay claims" under a contract that was "the result of the fraudulent bidding," "taint[ing] … every step thereafter taken." *Hess*, 317 U.S. at 543. The contractors' fraud caused, i.e. induced, the government to enter a contract, which then resulted in payments of claims.

Consistent with the common law and the Supreme Court's interpretation of the FCA, causation is a necessary element of fraudulent inducement. Because the fraud must be in the inducement, liability under the FCA for fraudulent inducement must turn on whether the fraud caused the government to contract.

Cimino raises several arguments to resist this conclusion. First, Cimino argues the text of the FCA indicates that the common law requirement of causation does not apply to fraudulent inducement claims. He notes the FCA expressly requires causation when a defendant causes someone else to violate the FCA. *See* 31 U.S.C. § 3729(a)(1)(A) & (B). And the FCA permits treble damages for "the amount of damages which the Government sustains *because of* the act of" the defendant. *Id*. § 3729(a)(1) (emphasis added). According to Cimino, these explicit causation requirements preclude a requirement of causation for fraudulent inducement.

Cimino's negative implication argument cannot carry the day. To begin with, claims for fraudulent inducement rest not on the text of the FCA, but on the recognition that the statute encompasses this common law claim, along with its common

law requirements, which include causation. Similarly, the negative implication canon "may have less force where the exclusion is a common law rule." Norman Singer & Shambie Singer, 2B SUTHERLAND STATUTORY CONSTRUCTION § 50:5 (7th ed. Nov. 2020 update). Under the presumption against change in common law, "[a] statute will be construed to alter the common law only when that disposition is clear." Antonin Scalia & Bryan A. Garner, READING LAW 318 (2012) (emphasis omitted). When Congress has abrogated the common law in the FCA, it has done so clearly. *See* 31 U.S.C. § 3729(b)(1)(B) (altering the common law scienter requirement); *Escobar*, 136 S. Ct. at 1999 n.2. When interpreting the FCA, the Supreme Court has imposed common law requirements even when the statute does not explicitly require them. *See Escobar*, 136 S. Ct. at 2002 (requiring materiality under 31 U.S.C. § 3729(a)(1)(A), although that provision makes no mention of it, and other provisions explicitly require materiality, such as § 3729(a)(1)(B)). Nothing in the text or structure of the FCA is inconsistent with applying the common law requirement of causation for fraudulent inducement.

Second, Cimino contends that causation is not required because the nexus between a defendant's fraud and the government's payment decision is covered by the element of materiality, which suffices in lieu of causation. Although related, materiality and causation are not the same. The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Causation here refers to whether fraud in fact caused the government to enter into a contract. To be sure, both materiality and causation require considering the effect of a defendant's fraud on the government's decision to enter a contract. But a statement could be material—that is, capable of influencing the

government's decision to enter a contract—without causing the government to do so. *See D'Agostino v. EV3, Inc.*, 845 F.3d 1, 7–8 (1st Cir. 2016); *see also U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 491 (3d Cir. 2017) (rejecting the conflation of materiality and causation in the FCA). Fraudulent inducement requires materiality and causation, separate elements that we cannot conflate.

Cimino finally resorts to the FCA's broader purpose of redressing fraud. He argues that, if causation is required, a contractor may lie to the government to obtain a contract but dodge liability if his lie does not cause the government to enter the contract. He maintains it would be "more consistent with the FCA's broad remedial purpose to hold those defendants accountable." Cimino Br. 35. The FCA, however, is not "an all-purpose antifraud statute." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008). Even putting aside the difficulty of determining which statutes are remedial (all statutes seek to remedy some problem), the FCA does not make actionable every misrepresentation to the government. Nor can generalized purposes surmised from the FCA overcome the conclusion, drawn from the common law and our precedents, that a fraudulent inducement claim under the FCA requires a showing of causation.

B.

Next we turn to the proper standard for causation and explain that Cimino was required to plead actual causation under a but-for standard. Accordingly, we reject Cimino's argument that he needed to plead *only* proximate cause under the substantial factor test.

Like other torts, fraud requires both actual and proximate cause, and as already explained, fraudulent inducement under

the FCA incorporates the common law causation requirement. Actual and proximate cause, however, are often confused. Actual cause, also called cause-in-fact or factual cause, concerns whether a defendant's conduct resulted in the plaintiff's harm. It refers to the ordinary understanding of causation, which asks for "proof that the defendant's conduct did in fact cause the plaintiff's injury." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013). Proximate cause, also called legal cause, concerns whether a defendant should be held legally liable for the conduct that caused the plaintiff's harm. Only some factual causes are legally cognizable. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 701 (2011). Although a defendant's conduct may have actually caused the plaintiff's harm, he is liable only if his actions are also the legal, i.e. proximate, cause of the plaintiff's harm.

To make out a claim under the FCA, Cimino must first plead actual cause because it is a well-established principle that actual cause precedes any analysis of proximate cause. Dan B. Dobbs, et al., DOBBS' LAW OF TORTS § 198 (2d ed. June 2020 update). Such factual or actual cause has traditionally been governed by the but-for test: "The traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred 'but for' the former." *Paroline v. United States*, 572 U.S. 434, 449–50 (2014). As the Supreme Court has instructed, "[t]his ancient and simple 'but for' common law causation test … supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). We have applied a but-for test when assessing whether a defendant's fraud caused the government damages under the FCA. *See U.S. ex rel. Schwedt v. Plan. Rsch. Corp.*, 59 F.3d 196, 200 (D.C. Cir. 1995).

Indeed, actual cause is practically synonymous with but-for cause.

Therefore, to plead fraudulent inducement, Cimino had to allege actual cause under the but-for test.[3] Here that means he would have to provide sufficient facts for the court to draw a reasonable inference that IBM's false audit caused the IRS to enter the license agreement.

Cimino urges us to adopt a different approach. He argues that he need not plead facts to allege actual cause at all, so long as he pleads facts plausibly demonstrating proximate cause, which he maintains should be analyzed under the substantial factor test. And Cimino contends that his complaint satisfies this test because, even if other factors also influenced the IRS's decision to enter the agreement, he alleged that IBM's false audit was a substantial factor in that decision. But Cimino cannot simply skip over a showing of actual cause and rely only on proximate cause. Irrespective of whether Cimino properly pleaded proximate cause, he was also required to plead actual cause under the but-for standard.

Resorting again to "the policies animating the FCA," Cimino argues that we should interpret this remedial statute broadly by pulling within its orbit any fraudulent actions that were a substantial factor in the government's decision—not just those that were a but-for cause. Cimino Br. 39. Liberal

---

[3] Cimino also gestures to the fact that but-for causation fails when there are multiple sufficient causes, and that the substantial factor test is applied "[w]hen each of two or more causes would be sufficient, standing alone, to cause the plaintiff's harm." DOBBS' LAW OF TORTS § 189. Cimino, however, fails to identify what the additional sufficient cause of the IRS's harm might be, so that exception has no bearing on this case.

construction of remedial statutes "needlessly invites judicial lawmaking," an invitation we decline. Scalia & Garner, READING LAW 364. Remedial statutes, like any other, should be interpreted to include all they fairly contain, not more and not less.

Cimino has presented no compelling reason to deviate from the ordinary common law rule. Therefore, he must allege but-for causation as a necessary element of a claim for fraudulent inducement under the FCA.

## III.

We next consider the dismissal of Cimino's fraudulent inducement and presentment claims under the FCA, which we review de novo. *Winder v. Erste*, 566 F.3d 209, 213 (D.C. Cir. 2009). A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To qualify as plausible, the pleaded facts must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"[B]ecause the False Claims Act is self-evidently an anti-fraud statute," a complaint filed under it must also meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002). When alleging fraud, a relator "must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Therefore, a relator must plead his FCA claim with both plausibility and particularity. We hold that Cimino satisfied these standards

with respect to both causation and materiality for fraudulent inducement, but failed to plead with particularity his presentment claims.

A.

To make out a claim for fraudulent inducement under the FCA, a plaintiff must plead both causation and materiality.

We conclude that Cimino adequately pleaded but-for causation because he alleged facts that plausibly demonstrate the IRS would not have entered the agreement but for IBM's fraudulent conduct. Cimino asserted that "the IRS would not have entered into the License had it known that [IBM's] representations were false," J.A. 37 ¶ 131, and supported this conclusion with factual allegations. *Cf. Iqbal*, 556 U.S. at 679 (explaining that "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). He also alleged that, before the renewal negotiations began, the IRS wanted to *reduce* its software spending. The IRS thought it was underutilizing its IBM licenses and was not interested in renewing the entire license agreement.

Next, Cimino outlined the scheme that IBM concocted to induce the IRS to renew the license agreement. Cimino asserted that IBM devised a false audit showing the IRS was overutilizing its licenses and would owe significant compliance penalties—contrary to the IRS's expectations. IBM then presented this audit to several IRS officials, including McGrane. Although Cimino did not explicitly allege that McGrane, or any IRS official, accepted the audit, he came close; he alleged that IBM's "false representations [of compliance penalties] were relied upon by the IRS when it agreed to enter into the License." J.A. 37 ¶ 131. Moreover,

Cimino described the pivotal meeting at which IBM used the false audit to induce the IRS to enter the agreement. A week after the presentation of the audit, IBM told McGrane that it would waive the $91 million in compliance penalties if the IRS entered into the license agreement, but otherwise would seek to collect the penalties. McGrane signed off on the license agreement. One IBM employee present at this meeting thought the IRS was "very concerned" and "scared" of the audit.[4] A few weeks later, the IRS executed a new $265 million license agreement, despite previously seeking to reduce its software spending with IBM.

When we take these factual allegations together, they permit us to "draw the reasonable inference" from Cimino's complaint that but for IBM's false audit, the IRS would not have entered the agreement. *Iqbal*, 556 U.S. at 678; *see also Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (explaining that we should "draw all reasonable inferences in favor of the plaintiffs"). Cimino raises more than just general concerns of the IRS about the audit. His factual allegations "nudge[]" his theory that IBM's false audit caused the IRS to enter the agreement "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The district court doubted that IBM could obtain the new license agreement from the IRS by approaching McGrane when Kravitz, who had twice rejected the audit, was on vacation. But that disbelief did not merit dismissal in light of

---

[4] After highlighting the IRS's fear of the audit, Cimino alleged that the audit's findings were a "substantial factor" in the IRS's decision to renew the license agreement. J.A. 36 ¶ 127. The district court ruled that this allegation of the incorrect legal standard was "by itself fatal." J.A. 415. We need not assume, however, the truth of Cimino's legal conclusions. *Iqbal*, 556 U.S. at 680. Instead, we focus on the facts he pleaded.

Cimino's allegations. "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Id*. at 556.

On the facts alleged at the pleading stage, along with the reasonable inferences drawn from those allegations in Cimino's favor, we find Cimino plausibly alleged that, but for IBM's false audit, the IRS would not have entered into the license agreement. Whether Cimino can prove those allegations remains to be seen.

We also conclude that Cimino plausibly pleaded materiality for fraudulent inducement under the FCA. Materiality means a defendant's fraud has "a natural tendency to influence" or was "capable of influencing" the government's payment decision. 31 U.S.C. § 3729(b)(4). For a claim of fraudulent inducement, a defendant's fraud is material if it was capable of influencing the government's decision to enter into a contract.

Cimino plausibly pleaded materiality, with largely the same facts that supported his allegations of causation. Cimino maintained that, prior to the audit, the IRS thought it was underutilizing IBM's software and did not want to renew the agreement. In order to maintain the valuable agreement, IBM presented a false audit showing that the IRS was overutilizing the software and represented that the IRS would owe compliance penalties if it did not renew the agreement. The false audit was thus *capable* of influencing the IRS's decision to renew the agreement.

IBM focuses on the fact that the IRS continued to pay for the licenses and extended the license agreement despite its

purported knowledge of Cimino's allegations of fraud.[5] To be sure, in the context of the presentment of false claims, "if the Government pays a particular claim in full despite its actual knowledge [of the fraud], that is very strong evidence" of immateriality. *Escobar*, 136 S. Ct. at 2003. We have also observed that continued payment of claims the government knows might be fraudulent suggests the fraud was not material to the government. *See U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017).

The question here, however, is whether Cimino plausibly *pleaded* materiality for his fraudulent inducement claims. He did so. The district court's dismissal boils down to a disbelief that the IRS would pay IBM millions of dollars after learning that it had been hoodwinked. But Federal Rule of Civil Procedure 12(b)(6) requires us to accept Cimino's factual allegations as true, and those allegations plausibly plead that IBM's false audit was material to the IRS's decision to renew the license agreement. It is plausible that, had the IRS known IBM's audit was false, it would not have renewed the agreement. It is also plausible that the IRS could have later learned of IBM's fraud and continued to pay for the licenses for any number of reasons that do not render IBM's fraud immaterial. For example, the IRS may have felt obligated to pay until it received a legal determination that it was relieved of the agreement's terms. "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a

---

[5] It is not clear that the IRS's knowledge of IBM's alleged fraud was properly before the district court, as Cimino did not allege that knowledge in his complaint. *See Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006). IBM suggests we could take judicial notice of this fact. Because it does not change our conclusion, we assume without deciding that the district court properly considered the IRS's knowledge of IBM's alleged fraud.

complaint's factual allegations." *Twombly*, 550 U.S. at 556 (cleaned up). At a later stage in the litigation, evidence of the IRS's continued payment under the license agreement might be used to demonstrate that IBM's false audit was not material to the IRS. *See McBride*, 848 F.3d at 1034. But the resolution of these questions is for another day.[6]

We hold that Cimino plausibly pleaded causation and materiality and therefore reverse the district court's dismissal of his fraudulent inducement claims.

B.

In addition to fraudulent inducement, Cimino claimed that IBM presented false claims to the IRS when it billed the IRS for $87 million in compliance penalties disguised as new licenses and technical support. That is, Cimino alleged that IBM billed the government for services IBM did not in fact provide.

We agree with the district court that Cimino did not adequately plead the presentment of false claims. To satisfy the particularity demanded by Rule 9(b) for a presentment claim, a relator must plead details about the presentment, including when the false claims were presented and who presented those claims. *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004). Although a relator may plead allegations upon "information and belief," he may do so only when "the necessary information lies within the defendant's control," and the allegations are "accompanied by

---

[6] The Chamber of Commerce and Pharmaceutical Research and Manufacturers of America as amici suggest that finding materiality here will open the floodgates to meritless FCA suits. But we are not resolving the merits of whether the fraud alleged here is material and hold only that Cimino plausibly pleaded materiality.

a statement of the facts upon which the allegations are based." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994).

Cimino failed to plead with particularity IBM's presentment of false claims because he alleged only that IBM billed the IRS about $87 million for licenses that "were, upon information and belief, never actually provided to the IRS." J.A. 38 ¶ 140. He neither pinpointed *when* the false claims were presented other than sometime during the agreement's five years, nor identified *who* presented the false claims other than "IBM." *See Williams*, 389 F.3d at 1257 (rejecting as insufficient allegations that false claims were presented during an "open-ended time span" by "management"). Moreover, Cimino's allegation upon information and belief was impermissible because he failed to identify what necessary information lies within IBM's control or to flesh out any facts upon which his allegation that IBM never provided the software was based. *See Kowal*, 16 F.3d at 1279 n.3. We hold that Cimino fell short of plausibly alleging that IBM presented false claims to the IRS.

\* \* \*

For the foregoing reasons, we affirm the dismissal of Cimino's presentment claims and reverse the dismissal of Cimino's fraudulent inducement claims and remand for further proceedings.

*So ordered.*

Rao, *Circuit Judge*, concurring: The panel opinion correctly applies our precedents to the issues raised by the parties. I write separately to question whether the False Claims Act ("FCA") creates a cause of action for fraudulent inducement.

The text of the FCA does not readily suggest liability for fraudulent inducement as a separate cause of action. The FCA imposes liability for fraudulent *claims*, but it says nothing about fraudulently induced *contracts*. *See United States v. Bornstein*, 423 U.S. 303, 311 (1976) ("The language of the statute focuses on false claims, not on contracts."). As relevant here, a person violates the FCA if he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or when he "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). Both provisions require a false claim, which is defined as "any request or demand, whether under a contract or otherwise, for money or property." *Id.* § 3729(b)(2). The plain meaning of the FCA requires a request for payment that is false or fraudulent.

As one commentator has posited, "[b]ecause the statute is keyed to the presentation of fraudulent 'claims,'" the text of the FCA "says nothing about, and thus does not impose liability for, non-fraudulent and non-false claims submitted under fraudulently induced contracts." C. Kevin Marshall, *Fraudulent-Inducement Actions & the FCA's Statute of Limitations*, 62 Gov't Contractor 19 ¶ 133, May 13, 2020. If Congress had wanted to create liability for fraudulent inducement, it easily could have employed more expansive language. *See, e.g.*, Major Fraud Act of 1988, Pub. L. No. 100-700, 102 Stat. 4631 (codified as amended at 18 U.S.C. § 1031) (criminalizing "[m]ajor fraud against the United States" by imposing liability for a scheme "to obtain money or property

by means of false or fraudulent pretenses, representations, or promises").

With little discussion of the statutory text, our cases have suggested that fraudulent inducement under the FCA is a separate cause of action. Liability for fraudulently induced contracts may exist even though the claims made pursuant to the contract are genuine. As we have explained, "every claim submitted under a fraudulently induced contract constitutes a 'false claim' within the meaning of the Act (*i.e.*, is automatically tainted), even without proof that the claims were fraudulent in themselves." *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1323 (D.C. Cir. 2005). This result does not naturally follow from the text of the FCA, which repeatedly refers to a "false or fraudulent claim" and makes no mention of creating liability for bona fide claims arising from a contract induced by fraud.

We located the origin of a fraudulent inducement cause of action under the FCA in a 1943 Supreme Court decision, *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), *superseded by statute on other grounds*, Act of Dec. 23, 1943, ch. 377, 57 Stat. 608, 609. *See Bettis*, 393 F.3d at 1326. The Court in *Hess*, however, does not explicitly discuss fraudulent inducement or state that such a cause of action exists under the FCA separate from the presentation of false claims. Instead, the Court determined that contractors who induced the government to contract under collusive bids could be subject to liability under the FCA. *Hess*, 317 U.S. at 543. Without any citation, the Court concluded "[t]his fraud did not spend itself with the execution of the contract," and so "[i]ts taint entered into every swollen estimate which was the basic cause of payment" by the government. *Id*. The Court focused on the supposed congressional intent of "reach[ing] any person who knowingly assisted in causing the government to pay claims which were

grounded in fraud," and relied on statements in the legislative history that the FCA's purpose was to protect "against those who would 'cheat the United States.'" *Id.* at 544 (cleaned up).

Despite the discussion of these sweeping purposes, *Hess* could be understood to involve actual false claims within the plain meaning of the FCA because the inflated prices appeared on the claims themselves. *See* Brief for Petitioner at 10, 12–13, *Hess*, 317 U.S. 537 (No. 173), 1942 WL 54207; Brief for Respondent at 9–11, *Hess*, 317 U.S. 537 (No. 173), 1942 WL 54208. In any event, *Hess* is hardly a model of clarity regarding the existence of a fraudulent inducement cause of action.

In following *Hess*, however, we, as well as other courts, have read that decision as recognizing a cause of action for fraudulent inducement under the FCA, without proof that claims are false or fraudulent. *See Bettis*, 393 F.3d at 1326–27 (recognizing fraudulent inducement under the FCA but holding no fraudulent inducement occurred); *see also, e.g.*, *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999). Yet these decisions do not set forth a textual basis for fraudulent inducement under the FCA. And while we have recognized that a fraudulent inducement claim may exist under the FCA, no case in this circuit has found such liability. *See Bettis*, 393 F.3d at 1327; *U.S. ex rel. Schwedt v. Plan. Rsch. Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995). Although we are bound by the holdings of the Supreme Court and prior panels of this court, it is unclear whether the cases cited above definitively establish a separate cause of action for fraudulent inducement under the FCA, one that is unconnected to the presentation of a false or fraudulent claim.

Furthermore, reconsideration of a fraudulent inducement cause of action may be warranted because it exists in some

tension with recent Supreme Court decisions. When interpreting the FCA, the Court has focused on the specific language of the statute. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512–14 (2019); *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2001–02 (2016). Indeed, the Court has explicitly disclaimed reliance on the FCA's purpose and warned against "threat[s] to transform the FCA into an all-purpose antifraud statute." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008); *accord Escobar*, 136 S. Ct. at 2003. Fraudulent inducement may be one of those threats that has gone unnoticed.

Finally, I note that the creation of causes of action under the FCA may pose particular separation of powers problems. In other contexts, the Supreme Court has trimmed or eliminated judge-made causes of action that lacked a basis in statute, recognizing "the tension between [courts inferring causes of action or remedies] and the Constitution's separation of legislative and judicial power." *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020); *see also Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.") (cleaned up). In addition, the FCA expands who can prosecute false claims against the government through the qui tam procedure. Others have raised serious constitutional questions about placing the execution of the laws in private hands because it contravenes Article II's vesting of all executive power in the President. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 760–63 (5th Cir. 2001) (en banc) (Smith, J., dissenting); Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. 207, 211, 1989 WL 595854 (1989) (explaining that the Framers put "the power to execute the law … in hands that are both independent of the legislature and politically accountable to the

people"). Fraudulent inducement under the FCA thus may reflect a judicial expansion of a statutory cause of action layered on top of congressional expansion of prosecution outside the executive branch.

The plain meaning of the FCA, the Supreme Court's recent FCA decisions, and the lack of clarity in the precedents recognizing fraudulent inducement are all reasons for reconsidering, in an appropriate case, whether fraudulent inducement is a separate cause of action under the FCA.