# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 3, 2022         Decided May 17, 2022

No. 21-7039

UNITED STATES OF AMERICA, EX REL. VERMONT NATIONAL
TELEPHONE COMPANY,

AND

VERMONT NATIONAL TELEPHONE COMPANY,
APPELLANT

v.

NORTHSTAR WIRELESS, LLC, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00728)

———

*Jeffrey A. Lamken* argued the cause for appellant. With him on the briefs were *Bert W. Rein, Bennett L. Ross, Stephen J. Obermeier*, *Eugene A. Sokoloff*, and *Mark W. Kelley.*

*Seth P. Waxman* argued the cause for appellees. With him on the brief were *Catherine E. Stetson*, *Jonathan L. Diesenhaus*, *Ari Q. Fitzgerald*, *Howard M. Shapiro*, *Daniel S.*

*Volchok*, *Beth S. Brinkmann*, *Peter B. Hutt II,* and *Michael M. Maya. Joseph Meyer* and *Susan Pelletier* entered appearances.

Before: ROGERS, TATEL*, and PILLARD, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this qui tam action, Vermont National Telephone Company alleges that several telecommunications companies defrauded the United States Government of $3.3 billion by manipulating Federal Communications Commission rules and falsely certifying their eligibility for discounts on spectrum licenses. The district court dismissed the suit, resting its decision on the False Claims Act's "government-action bar" and its "demanding materiality standard." Because neither basis invoked by the district court warrants dismissal, we reverse.

**I.**

The Communications Act of 1934 authorizes the Federal Communications Commission to grant licenses allowing companies to use portions of the electromagnetic spectrum, "the range of electromagnetic radio frequencies used to transmit sound, data, and video across the country." *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1025 (D.C. Cir. 2017) (internal quotation marks omitted); *see* 47 U.S.C. §§ 307, 309. Once licensed, companies may use their allocated radio frequencies to provide television, cell phone, and wireless internet service. *SNR Wireless*, 868 F.3d at 1025.

To apportion spectrum licenses among competing companies, the Commission holds auctions that involve a

---

* Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

two-step license application process. *See* 47 U.S.C. § 309(j)(1); 47 C.F.R. §§ 1.2105, 1.2107. First, applicant companies submit "streamlined, short-form application[s]" providing, under penalty of perjury, information concerning their eligibility to bid in the auction. *SNR Wireless*, 868 F.3d at 1027 (internal quotation marks omitted); 47 C.F.R. § 1.2105. Companies claiming "bidding credits"—discounts used to cover part of the cost of licenses won at auction—must certify their eligibility for such credits in their short-form applications. *See* 47 C.F.R. §§ 1.2105(a)(2)(iv), 1.2110(f). Companies determined by the Commission to be "qualified to bid" based on their short-form applications may participate in the auction. *See id.* § 1.2105.

Second, winning bidders "file a more comprehensive long-form application" to demonstrate their qualifications to hold spectrum licenses and their eligibility for claimed bidding credits. *SNR Wireless*, 868 F.3d at 1027 (internal quotation marks omitted); 47 C.F.R. § 1.2107. Once the Commission publicly announces its acceptance of a winning bidder's long-form application, any "party in interest" may file a petition to deny the application on the grounds that granting it would be inconsistent with "the public interest, convenience, and necessity." 47 U.S.C. § 309(a), (d)(1); *see* 47 C.F.R. § 1.2108. The winning bidder may, in turn, "file an opposition to any petition to deny, and the petitioner a reply to such opposition." 47 C.F.R. § 1.2108(c). After reviewing the application and the pleadings filed, the Commission determines whether the winning bidder is qualified to hold a license. 47 U.S.C. § 309(d)(2); 47 C.F.R. § 1.2108(d).

A winning bidder that defaults on its "binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction" is subject to a "default payment." 47 C.F.R. § 1.2104(g)(2). And a bidder that violates the

Commission's rules in connection with its participation in the competitive bidding process may be subject to sanctions, including "forfeiture of [its] upfront payment, down payment or full bid amount." *Id.* § 1.2109(d). Such forfeiture penalties are assessed in a separate "forfeiture proceeding," initiated by a notice of apparent liability or a notice of opportunity for hearing. *Id.* § 1.80(f)–(h).

This case arose from Auction 97, in which companies bid for "exclusive access to 1,614 Advanced Wireless Services licenses in [three radio frequency] bands." Am. Compl. ¶ 2. When announcing the auction, the Commission's Wireless Telecommunications Bureau explained that small businesses would be eligible to receive bidding credits entitling them to either a 15-percent or 25-percent discount on their winning bids. *Id.* ¶ 48; *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for November 13, 2014* (*Auction Notice*), 29 FCC Rcd. 8386, 8411–12 (2014). The size of the bidding credits would depend on the business's attributable revenues over the preceding three years, which includes the revenues of the small business itself as well as those of any entity with "*de facto* control" over the business. *Auction Notice*, 29 FCC Rcd. at 8412–13; Am. Compl. ¶ 48.

Northstar Wireless, LLC ("Northstar") and SNR Wireless LicenseCo, LLC ("SNR") each submitted short-form applications to participate in Auction 97, claiming eligibility for the 25-percent bidding credit offered to "very small businesses" with less than $15 million in attributable revenues. Am. Compl. ¶¶ 3, 48, 82 (internal quotation marks omitted). Their applications disclosed that "they had acquired the capital that they needed to participate in the auction from DISH [Network]—a large, established corporation that was itself ineligible for bidding credits." *SNR Wireless*, 868 F.3d at 1027. The applications also disclosed that DISH, Northstar, and SNR

had adopted "joint bidding protocols and agreements" pursuant to which the three companies could coordinate their bidding strategies. *Id.* Based on their short-form applications, the Commission found Northstar and SNR "qualified to bid" in Auction 97. *Auction of Advanced Wireless Services (AWS-3) Licenses 70 Bidders Qualified to Participate in Auction 97*, 29 FCC Rcd. 13465, 13465 & n.3, 13477 (2014) (determining that applicants' short-form applications were "complete and compl[ied] with the Commission's competitive bidding rules and policies").

Northstar and SNR were "remarkably successful" in Auction 97, collectively winning 43.5 percent of the licenses in play. *SNR Wireless*, 868 F.3d at 1027–28. After the auction, Northstar and SNR submitted long-form applications for the licenses they won, reiterating that they were "very small businesses" entitled to bidding credits. *Id.* at 1028. The use of such credits would discount the price of Northstar's and SNR's winning bids from $13.3 billion to approximately $10 billion. Am. Compl. ¶ 100. Once the long-form applications became public, eight companies petitioned the Wireless Bureau to deny Northstar's and SNR's applications. *SNR Wireless*, 868 F.3d at 1028. All eight challengers argued that Northstar and SNR were ineligible for very-small-business credits because DISH effectively controlled them. *Id.* One challenger, VTel Wireless, Inc., also argued that Northstar and SNR withheld from the Commission material information about their relationship with DISH. *Northstar Wireless, LLC* (*FCC Opinion*), 30 FCC Rcd. 8887, 8940 (2015).

The Wireless Bureau referred the petitions to the full Commission for "consideration of the questions posed by the petitions to deny." *SNR Wireless*, 868 F.3d at 1028 (internal quotation marks omitted). The Commission concluded that Northstar and SNR were ineligible for bidding credits because

they were *de facto* controlled by DISH, such that DISH's large annual revenues were attributable to them. *FCC Opinion*, 30 FCC Rcd. at 8889–90. But based on the record before it, the Commission found no evidence "that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH" or "that they did not adequately disclose the nature of their relationship and joint bidding arrangements with DISH." *Id.* at 8890–91, 8941.

After the Commission issued its ineligibility determination, Northstar and SNR "notified the Commission that they would pay the full bid amount for some of the licenses they won [but] would default on their obligation to buy the rest." *SNR Wireless*, 868 F.3d at 1028. In response, the Commission ordered Northstar and SNR to pay a default payment consisting of (1) compensation for "the difference between their own winning bids in Auction 97 and the amount that the FCC receives when it re-auctions the licenses" and (2) "an additional payment equal to fifteen percent of [Northstar's and SNR's] own bids, or fifteen percent of the winning bid when their licenses are re-auctioned, whichever is less." *Id.* at 1029; *see* 47 C.F.R. § 1.2104(g)(2).

Northstar and SNR petitioned this court for review of the Commission's determination that they were ineligible for bidding credits. *SNR Wireless*, 868 F.3d at 1029. Our court upheld the Commission's ineligibility determination but remanded to the Commission "to give [Northstar and SNR] an opportunity to seek to negotiate a cure for the *de facto* control the FCC found that DISH exercises over them." *Id.* at 1025. On remand, the Commission directed Northstar and SNR to renegotiate their business arrangements with DISH and then submit revised agreements to the Commission. *Northstar Wireless, LLC*, 33 FCC Rcd. 231, 232–34 (2018). Northstar's

and SNR's petition for review of that FCC decision remains pending.

Meanwhile, and setting the stage for this case, Vermont National Telephone Company ("Vermont Telephone") filed a qui tam action against Northstar, SNR, DISH, and several affiliated companies (collectively, "Defendants"), alleging they violated the False Claims Act (FCA) by making false certifications and manipulating the Commission's auction rules to secure fraudulent bidding credits on spectrum licenses. Am. Compl. ¶¶ 1–7. As relevant here, the FCA imposes civil penalties on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay . . . money . . . to the Government." 31 U.S.C. § 3729(a)(1)(G); *see also id.* §§ 3729(a)(1)(A), (B), (C). The Act authorizes private entities like Vermont Telephone to bring actions on behalf of the government, sharing in the recovery when such actions succeed. *Id.* § 3730(b), (d). The district court, however, dismissed Vermont Telephone's suit, relying on the Act's government-action bar which forecloses qui tam actions "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." *Id.* § 3730(e)(3); *U.S. ex rel. Vermont National Telephone Co. v. Northstar Wireless LLC* (*Vermont Telephone*), 531 F. Supp. 3d 247, 251, 264–67 (D.D.C. 2021). The court also held that Vermont Telephone's allegations failed to satisfy the Act's "demanding materiality standard." *Id.* at 251, 268–70.

Vermont Telephone appeals, arguing that neither basis invoked by the district court supports dismissal. Defendants defend the district court's decision, and argue that we can affirm on the alternative grounds that Vermont Telephone has failed to plead its FCA claims with the requisite plausibility and particularity needed to satisfy Federal Rules of Civil

Procedure 8 and 9(b). Our review is de novo. *U.S. ex rel. Cimino v. International Business Machines Corp.*, 3 F.4th 412, 421 (D.C. Cir. 2021) (reviewing de novo dismissal of fraudulent inducement and presentment claims under the FCA).

## II.

Originally enacted during the Civil War, the FCA allows private individuals to bring qui tam actions in the name of the United States in order to "augment[] the government's limited enforcement resources" and "protect[] federal funds from fraud." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 545–46 (D.C. Cir. 2002); *see Singletary v. Howard University*, 939 F.3d 287, 292–93 (D.C. Cir. 2019) ("Congress enacted the False Claims Act in the 1860s in response to widespread fraud perpetrated by Civil War contractors."). As noted above, however, the statute's government-action bar forecloses qui tam suits "which [are] based upon allegations or transactions which are the subject of . . . an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3).

According to the district court, the Commission's post-auction licensing proceeding, which reviewed Northstar's and SNR's long-form applications for spectrum licenses and the petitions to deny them, triggered the government-action bar. *Vermont Telephone*, 531 F. Supp. 3d at 251, 264–68. Disagreeing, Vermont Telephone argues that the government-action bar is inapplicable because the Commission's licensing proceeding was not an "'administrative civil money penalty proceeding.'" Appellant's Br. 27 (quoting 31 U.S.C. § 3730(e)(3)).

The FCA nowhere defines the phrase "administrative civil money penalty proceeding." But to state the obvious, an

"administrative civil money penalty proceeding" is a proceeding in which an administrative agency may impose a civil money penalty. Defendants contend that the licensing proceeding qualifies as an "administrative civil money penalty proceeding" because the Commission imposed, or could have imposed, several different civil money penalties during that proceeding.

First, Defendants argue that the Commission levied civil money penalties by subjecting Northstar and SNR to default payments after they selectively defaulted on their winning bids in Auction 97. But even assuming that these default payments are civil money penalties, they have no bearing on whether the Commission's licensing proceeding is a "civil money penalty *proceeding*" for a simple reason: The default payments were not assessed during the licensing proceeding. In that proceeding, the Commission determined only whether Northstar and SNR were "qualif[ied]" to hold spectrum licenses and "eligible" for bidding credits. *FCC Opinion*, 30 FCC Rcd. at 8889, 8891. The question of whether to impose default payments arose later, after Northstar and SNR chose to selectively default on their obligations to pay for some of their winning bids. *See* Notice of Interim Default Payment Obligation for Auction 97 Licenses, Joint Appendix 960, 964 (notifying Northstar and SNR of their default payment obligations after they "cho[se] to selectively default"). It would make no sense to conclude that the Commission's ultimate imposition of default payments, triggered by an event that had not yet occurred at the time of the licensing proceeding, retroactively transformed the licensing proceeding into a civil money penalty proceeding.

Defendants insist that "[t]he fact that weeks passed between the eligibility decision [in the licensing proceeding] and the imposition of the penalties does not mean the latter was

not part of the proceeding, any more than the fact that a criminal sentence can be imposed weeks or months after a guilty verdict means [that] sentencing is not part of the criminal proceeding." Appellees' Br. 40. This analogy misses the mark. Unlike a criminal sentence, the default payments did not "flow[] directly," *id.*, from the Commission's determination in the licensing proceeding that Northstar and SNR were ineligible for bidding credits. An intervening event—Northstar's and SNR's decisions to selectively default—occurred before the Commission assessed default payments against these companies.

Second, Defendants point out that the Commission may assess "forfeiture penalt[ies]" for willful failure to comply with any FCC rule or regulation, 47 C.F.R. § 1.80(a), including the rule prohibiting the intentional submission of false or misleading statements to the Commission, *id.* § 1.17(a). Commission regulations, however, authorize assessment of forfeiture penalties only in "forfeiture proceeding[s]," which the Commission initiates by issuing either a "notice of apparent liability" or a "notice of opportunity for hearing." *Id.* § 1.80(f)–(h). Because the Commission issued neither, it never initiated a forfeiture proceeding and so had no authority to impose forfeiture penalties. *See* 47 U.S.C. § 503(b)(3)(a), (4) ("[N]o forfeiture penalty shall be imposed under this subsection against any person unless and until . . . the Commission issues a notice of apparent liability" or provides "notice and an opportunity for a hearing before the Commission or an administrative law judge.").

Third, Defendants allude to "other penalt[ies]" that the Commission may impose, citing language from the Communications Act and Commission regulations stating that "[a] forfeiture penalty under this subsection shall be in addition to *any other penalty*" provided for by the statute. *Id.*

§ 503(b)(1) (emphasis added); *accord* 47 C.F.R. § 1.80 n.1. In search of "other penalt[ies]" available to the Commission during its licensing proceeding, 47 U.S.C. § 503(b)(1), Defendants point to several Commission public notices and orders which state that "[s]ubmission of a false certification to the Commission may result in penalties, including monetary forfeitures, license forfeitures, ineligibility to participate in future auctions, and/or criminal prosecution." *Application of Winstar Broadcasting Corp.*, 20 FCC Rcd. 2043, 2051 n.55 (2005); *accord Auction of Broadband PCS Spectrum Scheduled for May 16, 2007*, 22 FCC Rcd. 433, 448, 454 (2007). But aside from monetary forfeitures, which the Commission may assess only in separate forfeiture proceedings, none of the penalties listed in these notices and orders is monetary. Defendants cite no authority, nor are we aware of any, that permits the Commission to issue civil money penalties without first initiating forfeiture proceedings.

Because the Commission had no authority to assess civil money penalties during its licensing proceeding, which evaluated only Northstar's and SNR's long-form applications and the petitions to deny them, the licensing proceeding was not an "administrative civil money penalty proceeding." The government-action bar therefore poses no impediment to Vermont Telephone's suit.

## III.

To be actionable under the FCA, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision." *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192 (2016). A misrepresentation is "material" under the Act if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt

of money or property." 31 U.S.C. § 3729(b)(4); *accord Cimino*, 3 F.4th at 419.

The district court concluded that Vermont Telephone failed to plausibly allege any false claims capable of influencing Northstar's and SNR's eligibility for bidding credits in Auction 97. *Vermont Telephone*, 531 F. Supp. 3d at 270. We disagree. Vermont Telephone alleged that Northstar and SNR "knowingly failed to disclose all of their instruments, agreements, and understandings with . . . DISH" and "falsely certified" that they had disclosed all instruments, agreements, and understandings relevant to their claimed bidding credits in Auction 97. Am. Compl. ¶¶ 125, 128. Specifically, Vermont Telephone alleged that the two companies failed to disclose their agreement to transfer or resell their spectrum to DISH after a five-year non-transfer period. *Id.* ¶¶ 125–27, 130. Because an applicant's attributable revenues in Auction 97 included those of any entity to which the applicant had agreed to resell "more than 25 percent of the spectrum capacity of any individual license," *id.* ¶ 56, Northstar's and SNR's undisclosed spectrum-resale arrangements would have increased their attributable revenues beyond the $15-million cap for very-small-business credits, *id.* ¶ 48. Northstar's and SNR's alleged false certifications and failures to disclose agreements central to their eligibility for bidding credits were certainly "*capable* of influencing" the Commission's bidding-credit-eligibility determination. *Cimino*, 3 F.4th at 423.

Echoing the district court's reasoning, Defendants argue that the alleged undisclosed agreements would not have changed the Commission's ultimate decision to deny bidding credits because the Commission found Northstar and SNR ineligible for credits even without the disclosure of any such agreements. But, as other circuits have explained, the FCA's materiality inquiry "focuses on the potential effect of the false

statement when it is made." *U.S. ex rel. Loughren v. Unum Group*, 613 F.3d 300, 309 (1st Cir. 2010); *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 470 (5th Cir. 2009) (focusing on "the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered," and noting that the Fourth, Sixth, and Ninth Circuits have adopted the same interpretation of the FCA's materiality standard (internal quotation marks omitted)). At the time Northstar and SNR submitted their short- and long-form applications, their eligibility for bidding credits depended on their disclosure of all "agreements, arrangements or understandings of any kind relating to the licenses being auctioned." 47 C.F.R. § 1.2105(a)(2)(viii) (requiring "[c]ertification that the applicant has provided" all agreements, arrangements, and understandings); *id.* § 1.2112 (b)(2)(vii) (requiring applicants to "[l]ist and summarize any agreements in which the applicant has entered into arrangements for the use of any of the spectrum capacity of the license that is the subject of the application"). Moreover, if Northstar and SNR had disclosed their alleged agreements to "[resell] the spectrum purchased during the auction" to DISH, Am. Compl. ¶ 130, they "could not have qualified as 'very small businesses,' and thus could not have received the 25 percent [bidding credits]," *id.* ¶ 132; *see id.* ¶ 56. Northstar's and SNR's alleged false certifications and failures to disclose agreements therefore had the potential to affect the Commission's eligibility determinations regarding such bidding credits.

Defendants cite the Supreme Court's decision in *Escobar* and our decision in *McBride*, urging us to focus on the Commission's "actual" decision to deny bidding credits rather than the potential effect of Northstar's and SNR's misrepresentations. Appellees' Br. 45, 48 (internal quotation marks omitted) (citing *Escobar*, 579 U.S. at 193 and *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032 (D.C.

Cir. 2017)). But those decisions looked to the government's "actual behavior" only to assess whether the government attaches importance to a particular statutory, regulatory, or contractual requirement. *Escobar*, 579 U.S. at 193–94 (internal quotation marks omitted); *see McBride*, 848 F.3d at 1033–34 (considering the government's prior cost determinations as evidence on summary judgment that a contractor's voluntary disclosure of headcount data had no "connection" or "relevan[ce]" to such cost determinations). "[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated," for instance, "that is strong evidence that the requirements are not material." *Escobar*, 579 U.S. at 195; *accord McBride*, 848 F.3d at 1034. Vermont Telephone's complaint contains no allegations suggesting that the Commission attached minimal importance to Northstar's and SNR's alleged misrepresentations. *See Cimino*, 3 F.4th at 423 ("The question here . . . is whether [the plaintiff] plausibly *pleaded* materiality."). Rather, the amended complaint suggests just the opposite, emphasizing that an applicant who fails to certify that it has disclosed all agreements relating to auctioned licenses will not be permitted to participate in the auction. Am. Compl. ¶¶ 57–61; 47 C.F.R. § 1.2105 (a)(2)(viii), (b)(1)(i).

Seeking to cast doubt on Vermont Telephone's allegations, Defendants assert that any misrepresentations in Northstar's and SNR's short-form applications could not have affected their "*initial* [discounted] post-auction payments" because the Commission "substantially review[s]" eligibility for bidding credits only after applicants file their long-form applications. Appellees' Br. 46–47 (internal quotation marks omitted). Any disputes regarding whether the Commission substantially reviews short-form applications, however, should be addressed at a later stage in this litigation. The question

before us at the motion-to-dismiss stage is only "whether [Vermont Telephone] plausibly *pleaded* materiality." *Cimino*, 3 F.4th at 423. For the foregoing reasons, Vermont Telephone has done so.

**IV.**

Because the FCA is an antifraud statute, plaintiffs alleging claims thereunder must satisfy the "plausibility" pleading standard set forth in Federal Rule of Civil Procedure 8, as well as the heightened "particularity" standard set forth in Rule 9(b). *Cimino*, 3 F.4th at 421. Under Rule 8, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Under Rule 9(b), the complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Defendants urge us to affirm on the alternative grounds, not reached by the district court, that Vermont Telephone failed to adequately plead its claims under Rules 8 and 9(b). We decline to do so and conclude that Vermont Telephone has adequately pleaded its claims.

Beginning with Rule 8, Vermont Telephone pleaded facts "allow[ing] the court to draw the reasonable inference" that Northstar and SNR falsely certified their disclosure of all agreements related to auctioned licenses when, in fact, they failed to disclose agreements to act on DISH's behalf and transfer spectrum rights to DISH. *Cimino*, 3 F.4th at 421. In particular, Vermont Telephone alleged the following: (1) Northstar and SNR were formed as shell companies without any assets or revenues, at DISH's direction, shortly before the deadline to apply for Auction 97, Am. Compl. ¶¶ 16, 24; (2) Northstar and SNR bid for spectrum licenses in Auction 97

"with financing provided almost exclusively from entities controlled by . . . DISH," *id.* ¶ 91; (3) Northstar and SNR bid anonymously for the same licenses 744 times during the auction, *id.* ¶¶ 67, 92, 95; (4) Northstar and SNR frequently accepted the Commission's random selection of the winner when they submitted identical winning bids, *id.* ¶ 96; (5) Northstar and SNR "finished the auction with geographic gaps in their spectrum licenses" which afforded complete coverage only when combined, *id.* ¶ 97; (6) Northstar's and SNR's post-auction selective defaults created "geographic holes in [their] individual coverage" while "promoting the uniformity of spectrum coverage provided by their combined holdings," *id.* ¶ 105; (7) Northstar's and SNR's dispersed spectrum blocks from Auction 97 "made no sense from the point of view of providing communications services," *id.* ¶ 117; (8) neither Northstar nor SNR had "taken steps to deploy a wireless system" in the four years since Auction 97 concluded, *id.* ¶ 120; and (9) DISH guaranteed Northstar's and SNR's default payment obligations when each entity selectively defaulted, *id.* ¶¶ 106–07.

Defendants offer alternative explanations for Northstar's and SNR's conduct, asserting that such conduct is "consistent with the *absence* of any undisclosed agreement(s)." Appellees' Br. 55. Perhaps so, but the question before us on a motion to dismiss is only whether the alleged undisclosed agreements to act on DISH's behalf or transfer spectrum rights to DISH are "plausible." *Iqbal*, 556 U.S. at 679. They are. As Vermont Telephone alleges in its amended complaint, the aforementioned conduct makes little sense unless Northstar and SNR agreed in advance that DISH would ultimately control the licenses won at auction. Am. Compl. ¶¶ 107, 117.

Vermont Telephone also satisfied Rule 9(b) by setting forth detailed allegations regarding the "time, place, and

manner" of the fraudulent scheme. *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). According to the amended complaint, members of the boards of Northstar's and SNR's parent companies submitted short-form applications on September 12, 2014, via the Commission's electronic submission portal, which contained false certifications that Northstar and SNR had disclosed all agreements, arrangements, and understandings related to the licenses in Auction 97. Am. Compl. ¶¶ 83–84, 124–31. The alleged undisclosed agreements, which the parties entered into between August and September 2014, involved Northstar's and SNR's procurement of spectrum licenses on DISH's behalf. *Id.* ¶¶ 16, 24, 108–09, 125–31, 142. On February 13, 2015, Northstar and SNR submitted long-form applications confirming and recertifying all disclosures and representations made in their short-form applications. *Id.* ¶ 90. These allegations satisfy Rule 9(b)'s particularity requirement, as they provide "sufficient substance to . . . both afford [Defendants] the opportunity to prepare a response and to warrant further judicial process." *Heath*, 791 F.3d at 125.

## V.

For the foregoing reasons, we reverse.

*So ordered.*